[No. 10348. Department One. August 24, 1912.]

GLADYS AUSTIN *et al.*, *Respondents*, v. THE CITY OF
BELLINGHAM, *Appellant*.[1]

WATERS AND WATER COURSES—OBSTRUCTION—FLOODING LANDS—
LIABILITY OF CITY. A city has no right to so obstruct the outlet of a lake for the purposes of a water supply as to raise the water above high water mark and overflow or injure the lands lying above the line of ordinary high water.

SAME—"BEDS AND SHORES"—STATUTES—"HIGH WATER MARK."
Rem. & Bal. Code, § 8005, giving to cities the right to occupy and use the beds and shores of lakes up to the high water mark does not mean the highest water reached during annual flood periods, but means the upland boundary of tide and shore lands separating soil adapted for use from that which is submerged so long or frequently in ordinary seasons that vegetation will not grow upon it.

SAME—FLOODING LANDS—MEANDER LINE. In an action to enjoin the obstruction of the outlet of a lake, raising the water above the line of high water mark, the location of the meander line is immaterial.

SAME—ACTION FOR FLOODING—INJUNCTION—JUDGMENT—FORM. A judgment enjoining a city from obstructing the outlet of a lake is inapt where it prohibits the city from in any manner obstructing the "normal" flow, and should recognize the right of the city to raise the waters to the line of ordinary high water.

SAME—FLOODING LANDS—LIABILITY OF CITY. A city raising the waters of a lake above high water mark is liable to littoral owners for damages resulting from overflow or seepage through and under adjoining soil.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered February 1, 1912, upon

[1]Reported in 126 Pac. 59.

findings in favor of the plaintiffs, in an action to restrain the flooding of land by the maintenance of a dam.    Affirmed.

*Dan F. North, T. L. McFadden,* and *George Livesey,* for appellant.

*Neterer & Pemberton,* for respondents.

CHADWICK, J.—Lake Whatcom is a navigable body of water, with meandered border.   Plaintiffs and their predecessors in interest settled upon lands bordering on the shores of the lake in 1883, and having complied with the public land laws of the United States, patent issued on June 30, 1889.

The city of Whatcom maintains a gravity water system, taking water from the lower end of Lake Whatcom at a point just above its outlet.   In order to maintain a proper pressure during the summer months and to insure a greater degree of purity, the city, in April, 1911, put in a mud-sill across the creek bottom and on it put a board dam, the object of which was to raise the waters of the lake.   This action was brought by plaintiffs to restrain the city from longer obstructing the free flow of the waters of the lake, alleging that the dam had so raised the waters as to overflow, or to speak more accurately, back the waters into and over the low flat land owned by plaintiffs, and thus render it incapable of improvement and cultivation.   From a decree in favor of the plaintiffs, the city has appealed.

The record is long and involved, and appellant has briefed its case upon the theory of fact maintained by it throughout the trial; but inasmuch as the trial judge announced his purpose to view the situation for himself, we are inclined to hold with him that the putting in and maintaining of the dam raised the waters of the lake about eighteen inches above the line of ordinary high water, or enough to seriously interfere with the use and enjoyment of respondents' land.

Appellant contends that owners of land abutting a navigable lake have no right below the line of high water mark; or, to put it the other way, the appellant can, without ad-

verse legal consequence, raise the water to the line of high
water mark.

The cases following *Eisenbach v. Hatfield,* 2 Wash. 236,
26 Pac. 539, 12 L. R. A. 632, are relied on. These cases
are determinative only as we find them to fit the facts of a
particular case. In the instant case, there is testimony to
the effect that there have been times when the waters of the
lake were as high or higher than they were after appellant
had installed its dam, and that the grass on plaintiffs' land
is largely sedge or swamp grass. But it is also shown that
these rises occur only in what may be called flood seasons,
following the unusual rains and storms of winter; that, prior
to the installation of the dam, lands that are now flooded or
saturated had, during the summer months, been cultivated or
pastured; that the uncleared portions thereof were covered
with tame grass and by a tree growth and stumps, indicat-
ing that the land was not swamp or marsh land. It will be
seen, therefore, that the cases relied on can support appel-
lant only in the event that we find the lands were flooded at
ordinary high water.

While it is true, as we have held many times, that a littoral
or riparian owner can assert no valuable rights below the line
of ordinary high water, we have not held in any case that
the owner of tide and shore lands can so use his property as
to injure or destroy the use of abutting property, without
meeting the consequential damages. This may be well il-
lustrated by reference to our boom cases  See, *Grays Harbor
Boom Co. v. Lownsdale,* 54 Wash. 83, 102 Pac. 1041, 104
Pac. 267, and cases there cited. There, as here, the user of
the tide or shore lands was claiming under the express or
implied license of the state. In the case of *Burrows v.
Grays Harbor Boom Co.,* 44 Wash. 630, 87 Pac. 937, it is
said that, "in the interest of appellants' business, the respond-
ents' lands are overflowed by back water." It was there con-
tended that there could be no consequential damages, but
this court held otherwise, saying that the user of the stream

was answerable where there had been an "actual permanent taking and permanent use made of respondents' land." And the damages for overflowing the adjacent lands of the upland owner were afterwards assessed.

We mark a difference between damaging of the shore line, or more strictly speaking the destruction of a boundary line, and a damage which is in the nature of a continuing trespass to the abutting lands. The one may be met by an action in damages. The other can be corrected only by resort to a court of equity. The cases cited by appellant go no further than to hold that, under our assertion of title to the tide and shore lands of the state, an upland owner has no littoral or riparian rights.

The city has acted under Rem. & Bal. Code, § 8005:

"And for all the purposes of erecting such aqueducts, pipe lines, dams or waterworks or other necessary structures in storing and retaining water, as above provided, or for any of the purposes provided for by this chapter, such city or town shall have the right to occupy and use the beds and shores up to the high water mark of any such watercourse or lakes, and to acquire the right by purchase, or by condemnation and purchase, or otherwise, to any water, water rights, easements, or privileges named in this chapter, or necessary for any of said purposes, and any such city or town shall have the right to acquire by purchase or by condemnation and purchase any lands, properties or privileges necessary to be had to protect the water supply of such city or town from pollution: Provided, that should private property be necessary for any such purposes or for storing water above high-water mark, such city or town may condemn and purchase, or purchase and acquire such private property."

Faith is put in the grant of a right to occupy and use the beds and shores of navigable lakes and streams up "to high water mark," but the term high water mark must be taken in its relative and not literal sense. High water mark has been defined to be "the upland boundary of tide and shore lands." *Washougal & La Camas Transp. Co. v. Dalles, Portland & A. Nav. Co.*, 27 Wash. 490, 68 Pac. 74.

"High water mark does not mean the height reached by unusual floods, for these usually soon disappear. Neither does it mean the line ordinarily reached by the great annual rises of the river, which cover in places lands that are valuable for agricultural purposes, nor yet does it mean meadow land adjacent to the river, which, when the waters leave it, is adapted to and can be used for grazing or pasturing purposes. The line, then, which fixes the high water mark is that which separates what properly belongs to the river bed from that which belongs to the riparian owner—that is, the owner of adjoining land. Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow on it, may be regarded as a part of the bed of the river which overflows it." 4 Words and Phrases, p. 3290, citing *Welch v. Browning*, 115 Iowa 690, 87 N. W. 430.

Nor can it be successfully contended that the state could, by the statute cited, grant some right that it did not possess. Its rights are limited to the line of ordinary high water, and not to the line of the highest water that may be proved.

The case of *Kalez v. Spokane Valley Land and Water Co.*, 42 Wash. 43, 84 Pac. 395, is cited by appellant as decisive of this case. We do not so read it. In that case it was contended that the lake from which waters were being taken was not navigable; or, if so, that that upland owner was entitled to protection as a riparian proprietor against an unlawful diminution of the waters of the lake. The court held that the lake was navigable and therefore that the upland owner could not enjoin an act which affected only the shore lands. A consequential injury to the upland was in no way involved. By consequential injury we mean physical injury. The court there said:

"Were it made to appear that the dam or gates erected, or about to be constructed, by the respondent had or would raise the water above the ordinary high water line, and to the injury of appellants' property, the court would doubtless furnish relief."

There being no riparian or littoral rights in the abutting owner, the state may grant the right to lower the water, at least to the line of ordinary low water. But an entirely different question occurs should it attempt to raise the water so as to destroy the use of land lying above the line of ordinary high water.

It is contended that there is no competent testimony fixing the meander line. This question is not now material. The rights of the abutting owner to bar aggressions of the owner of the shore lands or one having a right in the waters in a case where the damage results from back or flood waters, cannot be measured by reference to an arbitrary line, whether it be called a shore or meander line. Whether it be the one or the other, it cannot stop the flow or seepage of the water; and having no such power, although higher than the line of ordinary high water, it cannot be relied on as a legal bar to consequential damages to abutting lands.

In the event of an adverse decision on the merits, we are asked to modify the decision of the lower court. It is said:

"We contend that the decree should be so modified as to permit the maintenance of a dam in the future, provided such dam did not have the effect of backing the water over the property line of respondents."

The decree of the court is:

"It is therefore by the court considered, ordered, adjudged and decreed that the defendant City of Bellingham, its officers and agents, be and are hereby enjoined and restrained from erecting, constructing or maintaining a dam at the outlet of Lake Whatcom, the source of Whatcom Creek, and that the said defendant be enjoined and restrained from maintaining a dam at the outlet of said lake or the source of the said creek at or near the place where the said dam has been erected and constructed and maintained or at any place near the source of the said outlet so as to retard the natural and normal flow of the water from the said lake and so as to cause the water level in the said lake to be raised above the normal condition. . . . It is further considered, ordered, adjudged and decreed by the court that the said defendant

city is enjoined and restrained from obstructing the outlet of the said lake in any manner and enjoined and restrained from keeping or placing or causing to be kept or placed in Whatcom Creek at or near the outlet of the said lake, any dam or obstruction of any kind or character which shall interfere with the flow of the water and retard the natural and normal flow of the water at the outlet of said lake through Whatcom Creek."

The reason for requesting a modification is:

"The effect of an affirmation of this judgment *in toto* will be to make it the established law of this state, that a municipal corporation of the first class cannot build a dam of any kind on a navigable lake and must condemn the property of each and every littoral owner on such lake before it can establish a water system, if a dam be necessary for the establishment of such system."

The use of the word "normal" by the trial judge seems inapt. The decree should have provided that the city might raise the waters of Lake Whatcom to the line of ordinary high water, and to this extent the decree should be modified. We hardly think that the decree as written makes it necessary for the city to condemn the littoral rights of an upland owner, for he has none. This case does not involve a question of littoral right. We regard the act of the city rather in the light of a trespass upon the abutting land. The right of the city to raise the waters of Lake Whatcom to the line of ordinary high water is now recognized and confirmed. If it raises the waters higher than this, it must meet the consequences, either in damages or by way of condemnation, and whether the damages result from overflow or seepage through and under the adjoining soil.

Finally, it is contended that the award of damages is excessive. There is testimony to sustain the sum fixed by the trial judge. This, coupled with his view and knowledge of the actual condition, warrants us in refusing to reduce the award.

Affirmed.

PARKER, GOSE, and CROW, JJ., concur.