UNITED STATES of America, as Trustee for the Kalispel Indian Tribe and Individual Allottees, Plaintiff–Appellee,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a Municipal Corp., Defendant,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor–Appellant.

UNITED STATES of America, as Trustee for the Kalispel Indian Tribe and Individual Allottees, Plaintiff–Appellee,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a Municipal Corp., Defendant–Appellant,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor.

UNITED STATES of America, as Trustee for the Kalispel Indian Tribe and Individual Allottees, Plaintiff–Appellant,

and

Kalispel Indian Tribe, Intervening–Plaintiff,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a Municipal Corp., Defendant–Appellee,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor.

---

UNITED STATES of America, as Trustee for the Kalispel Indian Tribe and Individual Allottees, Plaintiff,

and

Kalispel Indian Tribe, Intervening Plaintiff–Appellant,

v.

PEND OREILLE PUBLIC UTILITY DISTRICT NO. 1, a Municipal Corp., Defendant–Appellee,

and

Department of Natural Resources, State of Washington, Defendant–Intervenor–Appellee.

Nos. 88–3617 to 88–3619 and 88–3669.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 30, 1989.

Decided March 6, 1991.

See also 585 F.Supp. 606.

James P. McNally, Ione, Wash., Jerry K. Boyd and Diane M. Hermanson, Paine, Hamblen, Coffin, Brooke & Miller, Spokane, Wash., for defendant-appellant Pend Oreille.

J. Lawrence Coniff, Asst. Atty. Gen., Olympia, Wash., for state appellant.

Roger J. Marzulla, Asst. Atty. Gen., Vicki Plaut, Margaret Crow, Margaret Klarquist, Elizabeth Ann Peterson, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Robert D. Dellwo and Brian Collins, Dellwo, Rudolph, & Schroeder, Spokane, Wash., for intervenor-plaintiff.

Before BROWNING, SCHROEDER and FLETCHER, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

The Kalispel Indian Reservation in northeastern Washington was established by President Woodrow Wilson by Executive Order No. 1904 on March 23, 1914. The Pend Oreille River forms the western boundary of the reservation. In 1955 the Pend Oreille Public Utility District (PUD) completed construction of the Box Canyon Dam downstream from the reservation.

Prior to construction of the dam, the water level of the river as it passed the reservation reached approximately 2041 feet during the spring, receded to 2022 feet by late summer, and remained at that level until the following spring. After completion of the dam, the spring level remained at 2041 feet, but during the remaining months of the year the water level rarely dropped below 2032 feet. Thus, because of the dam, land once flooded only in the spring was under water all year.

The United States brought a trespass action against the PUD on behalf of the Kalispel Indian Tribe and individual Kalispel Indian allottees, alleging the dam submerged riparian land traditionally used by the Tribe for agricultural purposes, and seeking damages and injunctive relief.

The Tribe filed a complaint in intervention asserting title to the bed of the river and seeking compensation for trespassory use. The Tribe also joined in the claim for trespass on riparian lands asserted on its behalf by the United States. The State intervened, alleging sovereign title to the riverbed had passed to the State upon its admission to the Union. The Tribe also sought to amend its complaint to assert a right to use of the waters of the river under *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The district court denied the motion as untimely. The United States did not join the Tribe

in its assertion of ownership of the riverbed or the right to use the waters of the river under *Winters*.

The district court divided the trial into three phases. Phase 1 was devoted to the issue of liability for trespass on riparian lands. Phase 2 was devoted to the dispute between the Tribe and the State over title to the riverbed. Phase 3 dealt with remedies.

After a bench trial in Phase 1, the court ruled in favor of the Tribe, concluding that by raising the level of the river the PUD trespassed on the Tribe's riparian lands. The State and the PUD appealed this ruling. The district court ruled in favor of the State in Phase 2, holding that the State, not the Tribe, had title to the riverbed.[1] The Tribe appealed this ruling. In Phase 3 the court awarded the Tribe damages for the trespass but denied injunctive relief. The issues raised in Phase 3 are the subject of a separate appeal.

## I

Following the district court's approach, we first consider whether the dam caused the waters of the river to trespass upon the Tribe's riparian lands where the river borders the reservation.[2] The parties agree that the ordinary high water line of the river marks the boundary between riparian lands and riverbed. If the dam raised the river above this line a trespass upon the Tribe's riparian lands occurred. The dispute is over the location of this line.

The district court held the ordinary high water line of the river as it flows past the reservation lay at an elevation of 2028 feet. Since all lands below 2032 feet are now permanently submerged, the court concluded operation of the dam trespassed on the Tribe's riparian lands.

The State and the PUD contend the ordinary high water line lay at an elevation of 2041 feet, and because the dam does not raise the river above that level no trespass

occurred. They argue the district court's contrary ruling is based upon a misconstruction of the applicable law and a clearly erroneous finding of fact.

## A

We first address the claim that the district court misconstrued the applicable law.

The State and the PUD argue that the line of ordinary high water is properly defined as the highest level reached by the stream each year, including the annual spring flood, averaged over a period of years. This formula places the ordinary high water line at 2041 feet. The United States and the Tribe contend that the line of ordinary high water is the line below which action of the water precludes the growth of useful land vegetation. This line corresponds with the highest level normally reached by the river each year, but excluding the annual spring rise. The district court found that prior to construction of the dam this line had lain at 2028 feet.

■ Federal and state law are the same on the definitional issue determinative of Phase 1 and we therefore need not resolve which controls. Both mandate exclusion of annual spring floods in calculating the ordinary high water line.

■ The federal rule was stated in *Howard v. Ingersoll*, 54 U.S. (13 How.) 409, 14 L.Ed. 189 (1851). The Supreme Court said:

[The riverbed] neither takes in overflowed land beyond the bank, nor includes swamps or low grounds liable to be overflowed, but reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cattle to range upon, as natural or uninclosed pasture.

*Id.* at 446. Under *Ingersoll*, lands periodically submerged but still useful for agricultural purposes are thus above the ordi-

---

1. The parties dispute the nature of the proceedings in Phase 2. The State and PUD assert a bench trial took place. The Tribe maintains the district court ruled against it on a motion for summary judgment.

2. For the purpose of Phase 1 of the trial, title to the riverbed was assumed to be in the State. We address the Tribe's conflicting claim to the riverbed in Part II.

nary high water line. More recently, this Circuit followed the *Ingersoll* approach in *United States v. Claridge*, 416 F.2d 933, 934 (9th Cir.1969), rejecting "the mistaken assumption that the annual spring floods of the river" determine the ordinary high water line. *Accord Borough of Ford City v. United States*, 345 F.2d 645, 648 (3d Cir.1965).

The Washington Supreme Court adopted the same rule in *Austin v. City of Bellingham*, 69 Wash. 677, 126 P. 59 (1912):

> "High-water mark does not mean the height reached by unusual floods; for these usually soon disappear. Neither does it mean the line ordinarily reached by the great annual rises of the river, which cover in places lands that are valuable for agricultural purposes; nor yet does it mean meadow land adjacent to the river, which, when the water leaves it, is adapted to and can be used for grazing or pasturing purposes. The line, then, which fixes the high-water mark is that which separates what properly belongs to the river bed from that which belongs to the riparian owner; that is, the owner of adjoining land. Soil which is submerged so long or so frequently, in ordinary seasons, that vegetation will not grow on it may be regards as a part of the bed of the river which overflows it."

*Id.*, 126 P. at 61 (quoting 4 *Words and Phrases* at 3290). The rights of the State to the riverbed, the court continued, "are

limited to the line of ordinary high water, and not to the line of the highest water that may be proved." [3] *Id.*

Thus, whether state or federal law controls, the district court properly excluded the annual rise of the Pend Oreille River in determining the river's ordinary high water line.

### B

■ The State and the PUD also challenge several of the district court's subsidiary findings of fact. The determinative factual issue, however, was whether, prior to construction of the dam, the lands between the elevations of 2028 and 2041 feet, though subject to seasonal flooding, were nonetheless useful for agricultural or grazing purposes, *see Ingersoll*, 54 U.S. at 446; *Austin*, 126 P. at 61; and the district court's finding that they were is well supported by the record.

Hydrological calculations established that prior to the construction of the dam, lands at the 2028 elevation were above the level of the river for three quarters of the year. Witnesses testified that prior to construction, hay was harvested, livestock was pastured and wild carrots and onions were gathered on lands at and below the 2028 foot elevation. As the district court noted, before operating the dam the PUD itself

3. We reject the arguments advanced by the State and the PUD to avoid *Austin.* Contrary to their argument, *Austin's* statement of the rule is not ambiguous in any respect relevant to this case. Neither is it dicta; and if it were, it would still be the best evidence as to how the Washington Supreme Court would decide the issue.

The State's argument that it is not bound by *Austin's* statement of the law because the State was not a party to the suit is frivolous.

We also reject the State's suggestion that we defer to the administrative practice of Washington's Department of Natural Resources in determining the ordinary water mark—Washington law is determined by the Supreme Court of the State, not by its executive agencies. The Washington Court may consider contrary administrative practice a reason for changing the rule adopted in *Austin, see Overton v. Washington State Economic Assistance Auth.*, 96 Wash.2d 552, 637 P.2d 652, 654 (1981), but we may not. The same is true of the argument that placing

the ordinary high water mark at a higher elevation would serve the public interest by preserving state ownership over shoreline areas valuable for public recreation; as well as the suggestion that the rule applicable to tidelands (that the line of ordinary high water is the mean high tide over a period of time) should be applied to non-tidal waters as well. The relevant question is what Washington law now is, not what it should be or may become.

Finally, we reject the contention of the State and the PUD that we should certify this issue to the Washington Supreme Court or stay our decision pending the outcome of a related case now working its way through the Washington courts. Certification is inappropriate when, as here, the supreme court of a state has already ruled and its decision is unambiguous. *See City of Houston v. Hill*, 482 U.S. 451, 470–71, 107 S.Ct. 2502, 2514, 96 L.Ed.2d 398 (1987); *In re Elliott*, 74 Wash.2d 600, 446 P.2d 347, 358 (1968). For the same reason, we decline to stay our decision.

obtained from individual Indian allottees flowage easements that provided:

> During the haying season which is approximately July 1 to September 15th of each year, ... Box Canyon Dam gates will be operated so that the level of the water ... will not exceed elevation 2028 feet.[4]

In addition, visual inspection by the district court judge revealed partially submerged tree stumps near the 2028 level.

In light of all this, we cannot say the district court's finding that the high water line was at an elevation of 2028 feet is clearly erroneous.

## II

We turn to the dispute between the Tribe and the State over ownership of the riverbed. The Tribe asserts beneficial title to the riverbed on two bases. First, the Tribe claims unrelinquished aboriginal title to the bed of the river, based upon possession from time immemorial. Second, the Tribe contends that prior to Washington's admission to the Union in 1889 the United States established a de facto reservation for the Tribe that included the riverbed.[5]

## A

■ We first address the Tribe's claim of aboriginal title. A tribe has aboriginal title to lands occupied exclusively by the tribe as its ancestral home. *United States ex rel. Hualpai Indians of Ariz. v. Santa Fe Pacific R.R. Co.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). For the

purposes of this appeal, the parties have assumed the Tribe had aboriginal title to the area involved in this litigation, including the riverbed, prior to admission of Washington State to the Union in 1889. The State contends, however, that the United States extinguished the Tribe's aboriginal title by taking, and that receipt by the Tribe of compensation for the taking following proceedings before the Indian Claims Commission "establishes conclusively that a taking occurred." *United States v. Dann*, 873 F.2d 1189, 1199 (9th Cir.1989).

The Indian Claims Commission was established by Congress in 1946, 25 U.S.C. § 70 (1963), to award compensation for taking of Indian lands by the federal government. *Id.* § 70a(4) (Supp.1982). The Tribe filed a complaint with the Commission in 1951 seeking compensation for the taking of its ancestral lands. The petition alleged the Tribe had occupied a large area of lands in the states of Washington, Idaho, and Montana "from time immemorial," and that the United States "did forcibly seize and take from [the Tribe] the said lands" without compensation. Petition of Kalispel Tribe before The Indian Claims Commission ¶¶ 4, 5. After seven years of litigation the Commission held in favor of the Tribe. The Commission found that "the United States, without [the Tribe's] consent, began acquiring or disposing of said lands for its own use and benefit ... until the [Tribe] was deprived of the entire tract.... [T]he [Tribe] received no compensation for any part of the same." *The*

---

4. The PUD contends the easements were offered in settlement of a dispute with individual Indian allottees and were therefore inadmissible under Federal Rule of Evidence 408. Rule 408 only bars admission of settlement offers "to prove liability for or invalidity of the claim or its amount." Fed.R.Evid. 408. "This rule ... does not require exclusion when the evidence is offered for another purpose...." *Id.; see also United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir.1990) ("Fed.R.Evid. 408 permits settlement evidence for any purpose except to prove or disprove liability or the amount of the claim.") Here, the easements were introduced only to prove that the disputed lands were suitable for agricultural use prior to construction of the dam.

5. The Tribe also appears to suggest the 1914 Executive Order establishing the current Reservation may have conveyed the riverbed to the Tribe. Such a claim would be meritless. When Washington was admitted to the Union in 1889, ownership of the riverbed passed from the United States to the State under the Equal Footing Doctrine. *Utah Div. of State Lands v. United States*, 482 U.S. 193, 196, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987); *Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 238, 258, 11 L.Ed. 565 (1845). When the Executive Order issued, the United States had no title or other claim to the riverbed it could convey to the Tribe by Executive Order, Act of Congress, or otherwise.

*Lower Pend D'Oreille or Kalispel Tribe of Indians v. United States,* 6 Ind.Cl.Com. 353, 368 (June 9, 1958). After five years of settlement negotiations, the United States agreed to pay the Tribe $3,000,000 in compensation for the taking of its aboriginal lands. This stipulated settlement was approved by the Commission on March 21, 1963, *Lower Pend D'Oreille or Kalispel Tribe of Indians v. United States,* 12 Ind. Cl.Com. 141 (March 21, 1963), and was paid by the United States in due course.

■ "The 'chief purpose of the Act [establishing the Commission] was to dispose of the Indian claims problem with finality.'" *United States v. Dann,* 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985) (quoting H.R.Rep. No. 1466, 79th Cong., 1st Sess., 10 (1945)). Consistent with this purpose, this court has repeatedly held that payment of a Commission award of compensation for a taking of aboriginal lands conclusively establishes that the aboriginal title has been extinguished. *United States v. Dann,* 873 F.2d 1189, 1194 (9th Cir.1989); *United States v. Gemmill,* 535 F.2d 1145, 1149 (9th Cir.1976). Our inquiry is therefore limited to whether the taking of the riverbed was in fact adjudicated by the Commission.[6] We think it is plain that it was.

The parties agree the land for which the Tribe sought compensation before the Commission measured 2,373,000 acres if the lands beneath the Pend Oreille River and other rivers and lakes were included, and 2,247,000 acres if the submerged lands were excluded. The first paragraph of the stipulation, approved by the Commission, states:

> [T]he Commission determined that [the Tribe] had proved aboriginal title to specifically described lands in Washington, Idaho and Montana, and that [the Tribe] was entitled to recover for the fair mar-

ket value thereof, and *it was stipulated that the area contained 2,373,000 acres.* 12 Ind.Cl.Com. at 142 (emphasis added). The Commission reiterated in its findings of fact that compensation was awarded for 2,247,000 acres of dry lands and 126,000 acres of submerged lands. *Id.* at 149. The point was made again by the Tribe's own attorney in a letter to the Commissioner of Indian Affairs, dated January 13, 1963, informing the Commissioner that "[i]t was stipulated by counsel for both parties that the area awarded by the Commission contained 2,373,000 acres, of which 2,247,000 acres were land, and 126,000 acres were water."

Despite this apparent clarity, the Tribe maintains the stipulation should be construed as covering only dry lands. The stipulation states the compensation of $3,000,000 was calculated on the basis of $1.34 per acre. Multiplying 2,247,000 acres by $1.34 yields $3,010,980, approximately the amount the Tribe actually received, while multiplying 2,373,000 acres by $1.34 results in a total of $3,179,820. Since the Tribe was not awarded the larger amount, the Tribe maintains the stipulation was meant to include only the dry acreage. However, the record reveals the contrary. As the Commission stated, "[n]o evidence was produced or suggested that the area under water was of any special value." *Id.* at 159. It is thus apparent the Commission awarded $1.34 per acre for the dry lands and no compensation for the submerged lands.

The Tribe argues the Commission could not have found all 2,373,000 acres had been taken by the United States because that figure includes the Tribe's current reservation, which the United States has not taken. From this the Tribe argues the 2,247,000 acre figure, which excludes the submerged

---

**6.** The Tribe appears to challenge the correctness of the Commission's finding that the riverbed was taken by the United States. The Tribe points out that it did not formally cede its aboriginal lands as a part of a treaty or other accommodation as commonly occurred with other tribes and thus it was necessary to establish the taking of the Tribe's aboriginal lands by other proof. *See, e.g., United States v. Gemmill,*

535 F.2d 1145, 1148 (9th Cir.1976). However, it is not open to the Tribe to argue, or this court to inquire, whether the Commission's finding that the riverbed was taken is supported by the record before the Commission. Jurisdiction to review the Commission's decision is vested exclusively in the Court of Claims. 25 U.S.C. § 70s(b) (Supp.1982). Neither party appealed the Commission's findings.

lands, must represent the lands the Commission found had been taken. One difficulty with the Tribe's argument is that the 2,247,000 acre figure also includes the current reservation since it excludes only the submerged lands. In any event, the January 13, 1963 letter from the Tribe's attorney to the Commissioner of Indian Affairs eliminates any ambiguity. The Tribe's attorney informed the Commissioner "that the $3,000,000 figure is a net figure *after* deduction of all gratuitous offsets ... including the value of the 4,600 acre Kalispel Reservation set aside for the Tribe by the Executive Order of 1914." (Emphasis in original). In short, the $3,000,000 settlement figure was calculated on the premise that the Tribe's present reservation was not taken by the United States.[7]

The district court properly held the Tribe cannot assert a claim to the riverbed based upon aboriginal title.

### B

The Tribe also asserts ownership of the riverbed as part of what it calls a "de facto reservation." The Tribe maintains that prior to the admission of Washington to the Union a series of actions by the United States treated the Tribe's current reservation, along with the bed of the river, as a reservation in fact, thereby establishing a reservation for the Tribe that included the river. The State counters that if a de facto reservation existed it did not include the bed of the river.

■ The parties dispute the appropriate standard of review on this issue. The Tribe maintains it should be allowed to proceed to trial if it has raised any triable issue of fact because, in its view, the district court ruled against it on summary judgment. *See Tzung v. State Farm Fire and Casualty Co.*, 873 F.2d 1338, 1339–40 (9th Cir.1989). The State contends an actual though truncated trial was held and therefore we must uphold the district court's judgment unless it was based upon

a clearly erroneous finding of fact or a mistaken view of the law. *See United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc). Because we conclude the Tribe's factual claims, even if true, are insufficient as a matter of law to establish the Tribe's title to the riverbed as part of a de facto reservation, we need not resolve this preliminary dispute.

The Tribe's theory, as described in its complaint, in motions before the district court, and in its briefs before this court, is that in the latter half of the nineteenth century its members were forced into the area constituting its current reservation by the encroachment of non-Indian settlers; that the United States encouraged the exclusive occupation of the current reservation by the Tribe by denying non-Indians homestead rights, mineral rights, and railroad patents in this tract; and that the federal government provided services to the Tribe's members in this area as if they were living on a reservation. The Tribe also maintains that its members historically have been dependent upon the river at this location and that the United States was aware of this dependence when it created the de facto reservation.

Assuming these claims, if true, may be sufficient to establish a de facto reservation, *see, e.g.*, *Minnesota v. Hitchcock*, 185 U.S. 373, 389–90, 22 S.Ct. 650, 656–57, 46 L.Ed. 954 (1902); *Sac & Fox Tribe v. Licklider*, 576 F.2d 145, 149–50 (8th Cir.1978); 18 Op.Att'y Gen. 141 (1885), they are insufficient as a matter of law to reserve the bed of the river to the Tribe.

■ A party seeking to establish that a grant by the United States includes the bed of a navigable river must meet a heavy burden. *See, e.g.*, *Utah Div. of State Lands v. United States*, 482 U.S. 193, 196–98, 107 S.Ct. 2318, 2320–21, 96 L.Ed.2d 162 (1987); *Montana v. United States*, 450 U.S. 544, 551–52, 101 S.Ct. 1245, 1251, 67 L.Ed.2d 493 (1981); *United States v. Holt State Bank*, 270 U.S. 49, 55, 46 S.Ct. 197,

---

7. We also note that even if the settlement confirmed the taking of the Tribe's aboriginal title to the present reservation, the Tribe could still assert title to the land (other than that beneath the navigable river) under the 1914 Executive Order. Thus, it would not be implausible that the Tribe would have agreed to relinquish its aboriginal title.

199, 70 L.Ed. 465 (1926). As the Court wrote in *Montana:*

> [B]ecause control over the property underlying navigable waters is so strongly identified with the sovereign power of government, it will not be held that the United States has conveyed such land except because of some international duty or public exigency. A court deciding a question of title to the bed of a navigable water must, therefore, begin with a strong presumption against conveyance by the United States, and must not infer such a conveyance unless the intention was definitely declared or otherwise made plain, or was rendered in clear and especial words, or unless the claim confirmed in terms embraces the land under the waters of the stream.

*Montana,* 450 U.S. at 552, 101 S.Ct. at 1251 (citations and internal quotations omitted).[8] The proof offered by the Tribe is insufficient to overcome this strong presumption against conveyance of a riverbed.

■ The Tribe seeks to meet its burden by relying upon the cases in which we have held tribal dependence upon a river is an important factor in resolving a dispute over title to the riverbed. *See Puyallup Indian Tribe v. Port of Tacoma,* 717 F.2d 1251, 1258 (9th Cir.1983); *Muckleshoot Indian Tribe v. Trans–Canada Enters., Ltd.,* 713 F.2d 455, 457 (9th Cir.1983); *Confederated Salish and Kootenai Tribes v. Namen,* 665 F.2d 951, 962 (9th Cir.1982). In each of these cases, however, there was compelling evidence that the United States intended to include the disputed riverbed in the reservation, in addition to the tribe's historic dependence on the disputed river.

The Puyallups were confined by treaty to a reservation with no access to a river which was the center of their "spiritual, religious and social life." *Puyallup,* 717 F.2d at 1259 (citation and internal quota-tions omitted). Fighting broke out between Indians and non-Indians in part because of the unavailability of the river. *Id.* at 1260. A meeting between the Puyallups and Territorial Governor Stevens was convened to seek an end to the hostilities. At the meeting, "Governor Stevens reminded the Indians that he had promised to modify the treaty reservations if they were unsuitable." *Id.* (citation internal quotations omitted). As a result of the meeting, "the Puyallup Reservation, at the insistence of the Indians, was enlarged specifically to include a segment of the Puyallup River." *Id.* at 1261. The Puyallups' specific insistence upon inclusion of the riverbed, followed immediately by expansion of the reservation by the United States to include the river, strongly suggested an intention on the part of the United States to include the riverbed within the newly enlarged reservation. Indeed, in *Muckleshoot,* a companion case decided the same day, we held this was the single most important factor in overcoming the presumption against conveyance. *Muckleshoot,* 713 F.2d at 458.

The existence of hostilities between the Puyallups and non-Indian settlers relating to the dispute over access to the river was also of great significance. *Puyallup,* 717 F.2d at 1260. The Supreme Court has repeatedly held that resolution of disputes over title to a riverbed must be guided by "a congressional policy ... to grant away land under navigable waters *only* 'in case of some international duty or public exigency.'" *Utah Div. of State Lands,* 482 U.S. at 197, 107 S.Ct. at 2321 (quoting *Shively v. Bowlby,* 152 U.S. 1, 50, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894)) (emphasis in original); *see also Montana,* 450 U.S. at 552, 101 S.Ct. at 1251. The outbreak of hostilities constituted the "public exigency" required by *Utah Div. of State Lands* and *Montana,* but absent here. *See Puyallup,* 717 F.2d at 1260.

---

8. Weighty policy considerations underlie this presumption against conveyance of a riverbed to a private party. Navigable waterways are "chiefly valuable for the public purposes of commerce, navigation, and fishery, and for the improvements necessary to secure and promote those purposes...." *Shively v. Bowlby,* 152 U.S. 1, 49, 14 S.Ct. 548, 566, 38 L.Ed. 331 (1894); *see also Utah Div. of State Lands v. United States,* 482 U.S. 193, 195, 107 S.Ct. 2318, 2320, 96 L.Ed.2d 162 (1987). Because these interests would be defeated by private ownership of the beds underlying navigable waterways, "[t]itle to such land [is] ... vested in the sovereign for the benefit of the whole people." *Utah Division of State Lands,* 482 U.S. at 196, 107 S.Ct. at 2320.

It was only "in light of these pertinent facts" that the *Puyallup* court concluded the presumption against conveyance of a riverbed had been rebutted. *Id.*

In *Muckleshoot*, the same two factors, absent here, were also present. "[T]he Muckleshoot Reservation was expanded at the insistence of the Indians specifically to include a section of the White River on which the Tribe could continue to exercise its traditional fishing lifestyle," 713 F.2d at 458; and the expansion of the reservation was a response to a serious threat of hostilities that constituted a "public exigency." *Id.* at 457–58. Again, only in light of these two factors did we hold that the presumption against conveyance of the riverbed was overcome. *Id.*[9]

Nor does *Confederated Salish and Kootenai Tribes v. Namen*, 665 F.2d 951 (9th Cir.1982), support the Tribe's position. There a treaty expressly included half of Flathead Lake within the boundaries of the reservation. *Id.* at 962. *Namen* thus fell squarely within the language of *Montana* that the intention to convey a lakebed could be found where the conveying instrument by its "terms embraces the land under the waters of the stream [or lake]." *Montana*, 450 U.S. at 552, 101 S.Ct. at 1251. There is no conveying instrument in this case that by its terms grants the bed of the Pend Oreille to the Tribe.

In contrast to the compelling factors present in *Puyallup, Muckleshoot*, and *Namen*, the Tribe offers no relevant evidence other than its dependence upon the river and the United States' awareness of this dependence. The other evidence offered by the Tribe—the concentration of the Tribe in the area of its present reservation, the exclusion of non-Indian settlers from that area, and the provision of federal services to members of the Tribe living there—may be relevant to establishing the existence of a de facto reservation; but none of these events is probative of an intent on the part of the United States to convey the riverbed to the Tribe.

### III

We turn finally to the Tribe's claim that the district court erred in denying the Tribe's motion to amend its complaint in intervention to assert a claim under *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908).[10] The Tribe proposed the amendment approximately eleven months after the court entered judgment against the Tribe in Phase 2 of the trial, and approximately two weeks prior to the commencement of Phase 3. The district court rejected the proposed amendment as untimely. The question is whether the district court abused its discretion. *Hurn v. Retirement Fund Trust*, 648 F.2d 1252, 1254 (9th Cir.1981).

Leave to amend "shall be freely given when justice so requires." Fed.R. Civ.P. 15(a). "The propriety of a motion for leave to amend is generally determined by reference to several factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party." *Hurn*, 648 F.2d at 1254. *See also Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir.1973). The district court relied solely upon the first of these factors in denying the Tribe's motion as untimely. However, "[d]elay alone does not provide sufficient grounds for denying leave to amend...." *Hurn*, 648 F.2d at 1254. The crucial factor is not length of delay, but prejudice. *Howey*, 481 F.2d at 1190. "Where there is a lack of prejudice to the opposing party and the amended complaint is obviously not frivolous, or made as a dilatory maneuver in bad faith, it is an

---

9. We do not mean to hold that these two factors are essential to any claim of tribal ownership to a riverbed, but only to emphasize that mere reliance upon a river is not enough to overcome the "strong presumption" against conveyance of a riverbed by the United States. *Montana*, 450 U.S. at 552, 101 S.Ct. at 1251.

10. In *Winters* and the subsequent case of *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), the Supreme Court held that a reservation of land to an Indian tribe may include by implication rights of usage of adjacent waters to the extent necessary to fulfill the purposes of the reservation. *Winters*, 207 U.S. at 576, 28 S.Ct. at 211; *Arizona*, 373 U.S. at 599–600, 83 S.Ct. at 1497.

abuse of discretion" to deny leave to amend. *Howey,* 481 F.2d at 1190–91.

█ The State urges us to decide on the record before us that the State would have been prejudiced if the amendment had been permitted. If prejudice were readily apparent from the record, we might decide the issue without benefit of findings by the district court. *See, e.g., Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1160 (9th Cir.1989). However, the record in the present case does not reflect what, if any, prejudice the State and the PUD would suffer if the Tribe were allowed to add its claim under *Winters.* We therefore reverse the district court's denial of the Tribe's motion for leave to amend, and remand for the district court to reconsider the motion. *See United States v. Webb,* 655 F.2d 977, 980 (9th Cir.1981).

Each party to bear its own costs on appeal.

AFFIRMED in part, VACATED in part, and REMANDED.