873 F.Supp. 1422 (1994)
UNITED STATES of America, et al., Plaintiffs,
v.
STATE OF WASHINGTON, et al., Defendants.
No. CV 9213.
United States District Court, W.D. Washington.
December 20, 1994.
*1423 *1424 *1425 *1426 Christopher Pickrell, Asst. U.S. Atty., W.D. of Wash., Seattle, WA, co-counsel for USA.
Allan E. Olson, Sharon I. Haensly, LaConner, WA, for Swinomish Indian Tribal Community.
William A. White, Asst. U.S. Atty., U.S. Dept. of Justice, Indian Resources Section, Environment & Natural Resources Div., Washington, DC, co-counsel for USA.
Mason D. Morisset, Pirtle Morisset, et al., Seattle, WA, for Tulalip Tribes.
Kevin R. Lyon, Olympia, WA, for Squaxin Island Tribe.
Richard Reich, Eric Nielsen, Office of the Reservation Atty., Taholah, WA, for Quinault Tribe.
Phillip E. Katzen, Allen H. Sanders, Debora Juarez, Evergreen Legal Services, Seattle, WA, for Jamestown, Lower Elwha, Pt. Gamble Bands of S'Klallam, Nisqually, Nooksack, Sauk-Suiattle, Skokomish, Squaxin Island, Stillaguamish Tribe, and Upper Skagit Tribes.
Annette M. Klapstein, John Howard Bell, Debra S. O'Gara, Law Office, Puyallup Tribe, Tacoma, WA, for Puyallup Tribe.
Daniel A. Raas, Harry L. Johnsen, Andrea S. McNamara, Bellingham, WA, for Lummi Tribe.
Bill Tobin, Vashon, WA, for Nisqually Indian Tribe.
Jack W. Fiander, In-House Counsel, Yakama Indian Nation, Toppenish, WA, for Confederated Tribes and Bands of the Yakama Indian Nation.
Robert L. Otsea, Jr., Laura Ann Lavi, Office of the Tribal Atty., Auburn, WA, for Muckleshoot Tribe.
Peter C. Monson, Indian Resources Sect., Denver Environment & Natural Resource Div., U.S. Dept. of Justice, Denver, CO, co-counsel for USA.
Kathryn Nelson, Amy C. Lewis, Eisenhower, Carlson, et al., Tacoma, WA, for Pt. Gamble Jamestown, & Lower Elwha Bands of S'Klallam and for the Skokomish Tribe.
Marc Slonim, John Arum, Richard Berley, Ziontz, Chestnut, et al., Seattle, WA, for Makah Tribe.
John Sledd, Suquamish, WA, for Suquamish Tribe.
Vernon Peterson, Regional Solicitor's Office, U.S. Dept. of Interior, Portland, OR, co-counsel for USA.
Leslie Barnhart, Quileute Natural Resources, LaPush, WA, for Quileute Tribe.
Nettie Alvarez, Richard Ralson, Seattle, WA, for Hoh Tribe.
John W. Hough, Sr., Asst. Atty. Gen., Olympia, WA, for State of Wash.
Robert K. Costello, Asst. Atty. Gen., Jay Geck, Olympia, WA, for Depts. of Fisheries & Wildlife.
Robert Zuanich, Seattle, WA, for Puget Sound Vessel Owners Assoc. and Gary Westman.
Jeffrey Jon Bodé, Bellingham, WA, co-counsel for Nooksack Tribe.
Mary Linda Pearson, Suquamish, WA, co-counsel for Suquamish Tribe.
Edward G. Maloney, Sedro Wooley, WA, Harold Chesnin, Mathews Garlington-Mathews & Chesnin, Seattle, WA, co-counsel for the Upper Skagit Tribe.
Robert C. Hargreaves, Asst. Atty. Gen., Olympia, WA, co-counsel for State of W.Va.
Steven Marshall, Perkins Coie, Bellevue, WA, James R. Rasband, Al Gidari, Perkins Coie, Seattle, WA, co-counsel for intervenors Puget Sound Shellfish Growers.
Eric Richter/John A. Roberts, Skeel, Henke, et al., Seattle, WA, for intervenor defendants James and Ann Carter, William and Charmond Adkins, Alexander, et al.
Harold P. Dygert, Asst. Atty. Gen., Joseph S. Montecucco, Jay D. Geck, Asst. Attys. Gen., Shellfish Div., Olympia, WA, co-counsel for State of W.Va.
*1427 James M. Johnson, Olympia, WA, co-counsel for intervenors 26 UPOW.
John A. Knox, Williams Kastner & Gibbs, Seattle, WA, counsel for amicus curiae party Inner Sound Crab Ass'n.

MEMORANDUM OPINION AND ORDER
RAFEEDIE, District Judge.

I. INTRODUCTION

A. History of the Case
This sub-proceeding, filed by the United States and 16 Indian Tribes,[1] involves the Stevens Treaties[2] which were interpreted in United States v. State of Washington, 384 F.Supp. 312 (W.D.Wash.1974) (hereinafter Washington I); aff'd, 520 F.2d 676 (9th Cir. 1975) (hereinafter Washington II); aff'd in substantial part, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). The parties filed this action seeking a declaration of the nature and extent of tribal off-reservation shellfishing rights, and the extent to which such rights may be affected by the following limiting provision ("the Shellfish Proviso"): "The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the territory ... Provided, however, that they shall not take shellfish from any beds staked or cultivated by citizens."[3]
Washington I was decided in 1974. At that time, the Court reserved jurisdiction to hear other unresolved issues arising out of the Stevens Treaties. In Washington I, the issue before the Court was the nature and extent of the treaty Tribes' off-reservation fishing rights with respect to anadromous fish. That decision established the locations of the Tribes' usual and accustomed grounds and stations and found that the Tribes were entitled to take 50% of the harvestable fish from those grounds and stations. Subsequently, the Supreme Court substantially affirmed the decision finding that the trial court had correctly adjudicated the nature and extent of the Tribes' fishing rights. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979) (hereinafter Fishing Vessel).
Thus, the treaty Tribes' rights with respect to anadromous fish in the Puget Sound area is the law of the land. Finally, on September 2, 1993, consistent with Washington I and Fishing Vessel, this Court ruled that "shellfish" are "fish," within the meaning of the Treaties. Thus, the treaty Tribes' right to take shellfish is limited, if at all, only by the Shellfish Proviso in the Treaties or to the extent that the Court finds the Moderate Living Doctrine to be applicable from the evidence and the law.

B. The Parties' Contentions
In this action, the tribal plaintiffs seek the following declaratory relief: (1) that they have the right to take 50% of all of the species of harvestable shellfish that may be safely harvested within their usual and accustomed grounds and stations; (2) that the usual and accustomed grounds and stations are those previously adjudicated in Washington I; (3) that the phrase "staked or cultivated by citizens" in the Shellfish Proviso be interpreted to mean only those non-natural beds that have been staked or cultivated; (4) that the right to take shellfish extends to *1428 natural clam beds that exist under the artificial shellfish beds; (5) that the Tribes' authority to regulate the harvest be confirmed; (6) that the Court order co-management of the resource between the Tribe and the State; (7) that the Court enjoin the application and enforcement of specific state statutes which the Tribes claim would be discriminatory in practice; (8) that the Upper Skagit Tribe is the successor to the Nuwha'ha and the Bsigwigwilts and is therefore entitled to take shellfish at the usual and accustomed grounds and stations of the Nuwha'ha and Bsigwigwilts; and (9) that the Yakama Nation has not established any usual and accustomed grounds and stations and thus is not entitled to take shellfish.
Because the Court has found that shellfish are fish, only a limited issue is currently before the Court, namely the effect of the Shellfish Proviso and the nature and scope of the remedy to be granted.
Opposing the plaintiffs are the State of Washington and the intervenors[4] who contend that the "staked or cultivated" provision protects state and private property from shellfishing by the Tribes. Alternatively, but in a similar vein, the intervening shellfish growers argue that the lands which they own or occupy and upon which they conduct the business of shellfish growing have been "staked or cultivated" within the meaning of the Treaties' Shellfish Proviso, hence they conclude that those lands should be exempted from tribal shellfishing under the treaties.

C. Canons of Interpretation
In interpreting the Shellfish Proviso, in general, the Court is bound by both general rules of interpretation, and the specific rules handed down by the Supreme Court which apply when Indian Tribes assert treaty rights. In particular, the Court must use special canons of construction to determine the meaning of Indian treaties, all of which amount to the same proposition: "[A]mbiguities occurring will be resolved from the standpoint of the Indians." Winters v. United States, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). Similarly, treaties with Indians "are to be construed, so far as possible, in the sense in which the Indians understood them, and `in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.'" Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (quoting Tulee v. Washington, 315 U.S. 681, 684, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942)).
These canons of construction, however, do not give the court license to interpret a treaty according to the Indians' preferences. The Supreme Court has left no doubt that "even Indian treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." Choctaw Nation, 318 U.S. at 432, 63 S.Ct. at 678. Such an exercise "would be an intrusion upon the domain committed by the Constitution to the political departments of the government." Choctaw & Chickasaw Nations v. United States, 179 U.S. 494, 532, 21 S.Ct. 149, 164, 45 L.Ed. 291 (1900).
Finally, in United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905), the Supreme Court adopted a "reservation of rights" approach in interpreting treaties with Indian Tribes. In Winans, the controversy arose when the settlers, who owned the land fronting the Columbia River, denied Indians access to the river abutting their land and by exercising their rights under state licenses to operate "fish wheels." The fish wheels, as admitted by the parties, gave the landowner "exclusive possession of the fishing places" by obstructing the Indians' access to the fishing areas. Id. at 382, 25 S.Ct. at 664.
Rejecting the landowner's arguments, the Supreme Court established a new theory of treaty interpretation: a treaty is not a grant of rights to the Indians, but a grant of rights from them, thereby implicitly containing a *1429 reservation of those rights not explicitly granted. Further, the Supreme Court found that such reservations of rights encompassed all the territory subject to the treaty, thereby imposing a "servitude upon every piece of land." Id. at 381, 25 S.Ct. at 664. Thus, the Court concluded that the starting point for analysis of the treaty is the Indian's preexisting rights.
With respect to general canons of treaty construction, the Court begins with the premise that the parties' intentions dictate the interpretation of a treaty. Choctaw & Chickasaw Nations, 179 U.S. at 531, 21 S.Ct. at 163. In determining those intentions, the Court must interpret words in a treaty according to their natural and ordinary meanings, when the words are unambiguous. Id. It is only when a court finds a word to be ambiguous that it may resort to extrinsic evidence. Id.
In addition, treaties may, when necessary, be interpreted in light of the surrounding historical circumstances. Choctaw Nation v. United States, 318 U.S. 423, 63 S.Ct. 672, 87 L.Ed. 877 (1943). Thus, the Court looks to the historical context surrounding the negotiations of the Stevens Treaties. The Court also finds the following canons of construction instructive: (1) a treaty should not be interpreted so as to render one part inoperative, Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979); (2) when the parties could have more easily expressed a particular intent by an alternative choice of words, the chosen words can be interpreted NOT to express that intent, Choctaw & Chickasaw Nations v. United States, 179 U.S. 494, 538, 21 S.Ct. 149, 166, 45 L.Ed. 291 (1900); and (3) that the practical construction adopted by the parties, namely post-treaty conduct, may be viewed to help determine the meaning of the treaty. Choctaw Nation v. United States, 318 U.S. 423, 431-32, 63 S.Ct. 672, 677-78, 87 L.Ed. 877 (1943).
Following these canons of construction, the Court finds that, when signing the Treaties at issue, the Tribes reserved the right to take shellfish from their usual and accustomed grounds and stations, subject only to the Shellfish Proviso. Furthermore, the words "staked or cultivated" in the proviso are ambiguous, and the Court concludes that the Shellfish Proviso does not apply to natural or native beds and that, under the Shellfish Proviso, artificial beds may be staked or cultivated, notwithstanding their location in private tidal lands. The Court interprets these relevant words in this way because of the reservation of rights by the Tribes, the historical context of the treaties, and the rules favoring the resolution of ambiguities in favor of Indian Tribes; in addition, the Court finds the plaintiffs' evidence as to the meaning of these words to be much more compelling and persuasive than the evidence opposed to it.

D. Interpretation of the Proviso and Allegations of Hardship
In this sub-proceeding, the Court was not asked to determine which tidelands or marine areas contain natural beds open to Indian fishing, and which contain artificial beds, those staked or cultivated beds not open to Indian fishing; thus this decision does not resolve those issues. Rather, this decision is meant only to determine the meaning of the Shellfish Proviso in the Stevens Treaties and what effect it has on the tribal right to take shellfish.
In reaching its decision, the Court may not rewrite the Treaties or interpret the Treaties in a way contrary to settled law simply to avoid or minimize any hardship to the public or to the intervenors. Indeed, the Court has no such power. Rather, amelioration from such hardships should be sought from Congress, which has the power to abrogate the treaty, or from the State of Washington, which sold the public tidelands without notice to the buyers of the pre-existing tribal fishing rights, and indeed the United States, which permitted such sales to occur without taking steps to secure such fishing rights.

II. INTERPRETATION OF TERMS IN THE STEVENS TREATIES
The resolution of the parties' contentions in this sub-proceeding depends on the interpretation of the Stevens Treaties. The Court had occasion to interpret some of the *1430 relevant language in Washington I, and finds those interpretations binding in this action. The language of the Shellfish Proviso however, has not been interpreted by the Court; thus, an extensive discussion of language and the meaning of the language is necessary.

A. Prior holdings

1. The Right of Taking Fish Includes the Right to Take Shellfish
The Court held on September 2, 1993, that the "right of taking fish" in the Stevens Treaties includes the right to take shellfish. The Court reached this conclusion without reference to the canons of constructions favoring Indians. Indeed, this interpretation is compelled by the plain language of the Treaties.
As previously discussed, the Shellfish Proviso limits the Tribes' right to take shellfish to those beds not "staked or cultivated" by citizens. This Proviso, plainly read, constitutes an exception to the right of taking shellfish at particular locations. It inevitably follows that shellfish were included in the "right of taking fish" referred to in the first sentence.[5] This interpretation is consistent with the principle that a treaty "should be interpreted so as not to render one part inoperative." Colautti v. Franklin, 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979). If the right of taking "fish" did not include shellfish, the entire shellfish proviso would serve no purpose.

2. The Right to Take Fish is not Limited to any Particular Species of Fish
Defendant and the intervenors have argued that the "right of taking fish" must be limited to those species of fish the Tribes actually took prior to the signing of the Stevens Treaties. At that time, however, the Tribes had the absolute right to harvest any species they desired, consistent with their aboriginal title. See Lac Court Oreilles Band, Etc. v. Voigt, 700 F.2d 341, 352 (7th Cir.1983). The fact that some species were not taken before treaty time  either because they were inaccessible or the Indians chose not to take them  does not mean that their right to take such fish was limited. Because the "right of taking fish" must be read as a reservation of the Indians' pre-existing rights, and because the right to take any species, without limit, pre-existed the Stevens Treaties, the Court must read the "right of taking fish" without any species limitation.
The effort by the defendants to read a species limitation into the "right of taking fish" must fail in light of the canons of construction favoring Indians. Defendant and the intervenors ask the Court to impose a limit on the "right of taking fish" without pointing to any treaty language in support of that interpretation. This is impermissible under Winters and Choctaw Nation. Moreover, had the parties to the Stevens Treaties intended to so limit the right, they would not have chosen the word "fish," a word which fairly encompasses every form of aquatic animal life. "Fish" has perhaps the widest sweep of any word the drafters could have chosen, and the Court will not deviate from its plain meaning.

3. "All Usual and Accustomed Grounds and Stations"
Washington I made a series of determinations as to the meaning and import of the phrase "usual and accustomed grounds and stations," in the context of adjudicating where the plaintiff Tribes enjoyed the right to fish for salmon and steelhead. No party to this sub-proceeding has challenged these determinations, and the Court finds, as explained below, that they are the usual and accustomed grounds and stations for shellfishing.
At trial, the Tribes presented evidence establishing areas in which they historically sought shellfish. However, before considering this evidence, the Court must resolve a preliminary issue of treaty interpretation: whether the usual and accustomed areas for shellfish can, as a matter of law, differ from the areas adjudicated in Washington I for salmon and steelhead. If the Court determines that they cannot, then the areas established *1431 in Washington I control this sub-proceeding as well.
The Court finds that, as a matter of treaty interpretation, the Tribes' usual and accustomed grounds and stations cannot vary with the species of fish. This conclusion is consistent with the Court's prior ruling finding the Tribes' usual and accustomed grounds and stations for herring as co-extensive with those for salmon and steelhead. See Post-Trial Decisions, 459 F.Supp. 1020, 1048-50. Indeed, the Court has never focused on a particular species of fish in determining The Tribes' usual and accustomed grounds and stations. See e.g., Washington I, 384 F.Supp. at 360, 364, 372; Post-Trial Orders, 626 F.Supp. 1405, 1467, 1528-29.
Therefore, the Tribes have the right to take shellfish at those usual and accustomed grounds and stations adjudicated in Washington I, including all bedlands and tidelands under or adjacent to those areas. In addition, however, the Upper Skagit Tribe, seeks to establish its usual and accustomed grounds and stations as those of the Nuwha'ha and the Bsigwigwilts, as well as other predecessor tribes. See infra Part VII. Other than the evidence put on by the Upper Skagit, the Tribes have stipulated in this sub-proceeding not to present evidence proving usual and accustomed grounds and stations beyond the prior-adjudicated grounds and stations.

4. "In Common With All Citizens"
The meaning of the term "in common with all citizens" is well-settled. "Both sides have a right, secured by treaty, to take a fair share of the available fish." Fishing Vessel, 443 U.S. at 684-85, 99 S.Ct. at 3074. According to the Supreme Court, to determine this "fair share" a court should "initially divide the harvestable portion of each run ... into approximately equal treaty and non-treaty shares, and should then reduce the treaty share if tribal needs may be satisfied by a lesser amount." Id. at 685, 99 S.Ct. at 3074. The lower boundary  this "lesser amount" is determined by analyzing the tribes' "moderate living" needs. See infra Part IV. The important concept here, however, is that the "in common with" language guarantees the Tribes a share of the fish and an "equal opportunity" to catch the fish. See Fishing Vessel, 443 U.S. at 679, 99 S.Ct. at 3071.

B. The Shellfish Proviso: "Any Beds Staked or Cultivated by Citizens"

1. Interpretations Proposed by the Parties
The intervening growers' proposed interpretation of the Shellfish Proviso starts and ends with the treaty-time dictionary. They argue that the Court should interpret "staked" and "cultivated" according to their dictionary definitions; essentially, this would mean that any shellfish bed extant today that is surrounded by stakes, or in some fashion improved by human labor, would be off limits to the Indians. The Tribes do not dispute that, under the definition of the treaty words advanced by the growers, all of the tideland owned or leased by the Growers falls within the Shellfish Proviso.
The intervening property owners depart to some extent from this literal approach arguing that "staked" should be interpreted in its "frontier" context and thus should be regarded as a synonym for "claimed as private property." Therefore, all privately-owned tideland, whether or not surrounded by stakes, would be protected by the Shellfish Proviso.
The Plaintiff Tribes' argue first that the terms "staked" and "cultivated" must be interpreted as they were used in the shellfishing industry at treaty time. This usage of the terms "staked" and "cultivated" by the shellfishing industry has two elements: the doctrinal definition and the empirical definition of the words, which is informed not by a dictionary, but by the actual practices of the shellfishing industry. Thus, while the doctrinal definition of the words might contemplate a broad set of activities, the empirical definition captures that narrower subset of activities that were actually performed at treaty time.
As will be shown below, the Tribes presented compelling evidence that only artificial beds were "staked" and "cultivated" at treaty time.

*1432 2. "Doctrinal Definition" of Shellfish Proviso Terms Within Shellfishing Industry

a. "BEDS"
The intervening growers presented evidence at trial that shellfish "beds," as that term was used at treaty time, included both natural and artificial shellfish deposits. Ingersoll's Glossary of Shellfish Terms ("Ingersoll's") defines "bed" as "The bank, reef or deposit of oysters in the water, either growing naturally or artificially, original or transplanted." The Tribes have not disputed Ingersoll's as the appropriate definition, and the Court will rely upon that definition in its analysis.

b. "STAKED"
The parties agree that the words "stake" and "staked" were commonly used in the shellfishing industry at treaty time. To "stake" a shellfish bed meant to plant stakes or other markers to indicate the boundaries of the bed.

c. "CULTIVATED"
Within the shellfishing industry at treaty time, the meaning of the terms "cultivate" and "cultivated" was quite narrow. Ingersoll's defines "cultivate" as "to raise oysters artificially from spawn, or from transplanted young."
The defendant and the intervenors have presented no evidence to directly contradict Ingersoll's definition of "cultivate." The intervening growers have shown that nineteenth-century oyster farmers performed a variety of activities to improve their harvest. Indeed, Moore states in his treatise that "all methods of oyster culture depend for their success upon the modification of the natural conditions in such a manner as to bring about one or several of the following results," such as the increase in the number of eggs and the increase in the surfaces available for fixation.
Reading Ingersoll's and Moore together, cultivation is the "modification of natural conditions" occurring after the oysters have been planted or transplanted in an artificial bed.

3. "Empirical Definition" of the Terms "Staked" and "Cultivated" as They Were Used in the Shellfishing Industry
At trial, the Tribes presented substantial evidence of the actual use of the terms "staked" and "cultivated" within the shellfish industry. This evidence falls into two categories. First, the Tribes attempted to reconstruct, state-by-state, the legal landscape governing the shellfish industry. The Tribes argue that at the time the Treaties were negotiated, the shellfishing laws almost universally prohibited the "staking" or "cultivating" of natural shellfish beds. Second, the Tribes presented evidence of actual shellfish industry practices, both on the East Coast and in Shoalwater Bay, Washington. The Tribes maintain that these practices, as might be expected, conformed to the laws governing the industry, thus no actual "staking" or "cultivating" of natural beds occurred at that time.

a. Laws Governing Shellfishing Practices
As part of an 1876 report, "On the Oyster Industries of the United States," Lieutenant Paul DeBroca authored a chapter entitled "Oyster Culture," in which he describes "American ostriculture" as consisting of the "planting of mollusks on those parts of the coast where the submarine soil is best fitted by its nature to fatten them and promote their growth."[6] In this chapter, DeBroca makes the following critical observation:
Whatever may be the locality chosen by the planters, they can in no case pursue their industry on the natural banks of oysters, the common property of the people, or in any way interfere with the free exercise of navigation.[7]
DeBroca defines "natural bank" as a "conglomeration of mollusca presenting a character of continuity, constituting what is usually called an oyster-bed."[8]
*1433 DeBroca's characterization of the legal landscape regarding natural shellfish beds is supported by the statutes and case law in force during the mid to late nineteenth-century.[9]
For example, a series of laws were enacted in the Washington territory concerning oysters and oyster cultivation after the signing of the Stevens Treaties.[10] Despite the fact that the laws post-date the Treaties, the Court nevertheless considers them important. First, each of these enactments, including the law related to Oyster preservation in Shoalwater Bay, provides separate treatment of natural and planted oyster beds. Second, the legislation, beginning with the 1861 Act to Encourage the Cultivation of Oysters, conforms exactly to DeBroca's characterization and permits the planting of oysters in areas except where natural oyster beds exist. Finally, these post-treaty enactments, by specifically recognizing property rights in planted oyster beds, imply that there was no common law property rights in planted beds, let alone natural beds, at or before treaty time.[11]
Moreover, many laws from other states also demonstrate the general rule of no staking or cultivating of natural beds.[12] This *1434 survey of laws and statutes, both from the East Coast and California, is consistent with DeBroca's characterization of the legal landscape, namely that one could not stake off and appropriate for private use a natural oyster bed at or before treaty time. Indeed, most of the statutes from these areas create new private property rights in planted beds, thereby implying that before passage of the legislation, no such rights existed.

b. Actual Shellfishing Practices

i. East Coast Practices
For the most part, the Court will assume that practices on the East Coast conformed with the laws governing the industry. Furthermore, the Angell treatise[13] and the DeBroca article[14] indicate that oyster farming, in practice, took place on artificial beds in the nineteenth-century.[15]

ii. West Coast and Shoalwater Bay Practices
The evidence indicates that the practices at Shoalwater Bay at and before treaty time were similar to those on the East Coast. In his 1854 "Report on a Reconnaissance of the Country Lying Upon Shoalwater Bay and Puget Sound," George Gibbs made the following remark:
The principal trade, so far, has been in oysters, which abound on the flats. They are taken up, during the low tides of summer, from their natural beds, separated, and replanted, as in the States.[16]
Similarly, on August 26, 1854, the Pioneer and Democrat, a local newspaper, contained the following description of the shellfishing practice at Shoalwater Bay:
The method of propagating oysters is to dig them up with tongs ... When dug up, the oysters are separated from the mass and buried about low-water mark, or even to high-water mark, so that the tide may ebb and flow over them....[17]
In addition, on January 6, 1855, the following appeared:
We are credibly informed that there are some thirteen streams emptying into Shoalwater Bay; that there are then at the present time a large community, who are cultivating, in true Chesapeake Bay style, the oyster....[18]

c. How Shellfish Laws and Practices Lead to an "Empirical Definition"
The shellfish laws and practices do give rise to an "empirical definition" of "staked" and "cultivated." The Court can ascertain an "empirical definition" of treaty words by viewing the words as they would have been viewed by the parties who participated in the treaty negotiations. In determining the parties' understanding of the words, the Court must consider the parties' actual experience with the words.
First of all, there is no doubt that the United States treaty negotiators were generally familiar with the East Coast shellfish industry and its practices. As outlined above, the East Coast shellfish industry followed a set of laws and practices whereby natural oyster beds were almost never "staked" or "cultivated." Furthermore, the evidence indicates that both George Gibbs and members of the signatory Tribes were familiar with the shellfishing practices occurring at Shoalwater Bay at treaty time. Indeed, *1435 as discussed in the previous section, the practices at Shoalwater Bay were modeled after East Coast practice: oyster farmers cultivated oysters by transplanting them to artificial beds and under no circumstances did they "stake" or "cultivate" natural beds. The "empirical definition" is one possible construction of the terms "staked" and "cultivated."

4. Resolution of Meaning of "Any Beds Staked or Cultivated"
The Court must interpret the Shellfish Proviso giving due regard to both the canons of construction favoring the Indians and the general principles of treaty interpretation. In this section, the Court analyzes the Shellfish Proviso in light of: (1) the surrounding treaty words, (2) the record of the treaty negotiations, (3) the historical circumstances that gave rise to the Stevens Treaties, (4) the possible alternative formulations of the Shellfish Proviso, and (5) the post-treaty conduct of both parties. Thereafter, the Court will conclude by presenting its understanding of the correct interpretation of the Shellfish Proviso.

a. The Shellfish Proviso Viewed in Light of the Record of Treaty Negotiations
The perspective and positions of the parties throughout the negotiation process can also shed light on the meaning of the shellfish proviso. To the extent that one party's statements  or silence  reflect its understanding of the other side's proposals, evidence of the negotiation process is persuasive evidence of the Shellfish Proviso's intended meaning.
The parties agree that the minutes of the treaty negotiations reflect no specific discussion of the Shellfish Proviso. However, certain statements in the treaty minutes are instructive as to the proper interpretation of the Shellfish Proviso, and the absence of certain statements or discussions reveals the intentions of the treating parties.
The most striking aspect of the treaty minutes is the paternal pose struck by the United States negotiators, including Governor Stevens himself. For example, Stevens made the following statement to the Tribes during the negotiations:
I think the paper is good and that the Great Father will think so. Are you not my children and also children of the Great Father? What will I not do for my children and what will you not for yours? Would you not die for them? This paper is such as a man would give to his children and I will tell you why. This paper gives you a home. Does not a father give his children a home? This paper gives you a school? Does not a father send his children to school? It gives you mechanics and a Doctor to teach and cure you. Is that not fatherly? This paper secures your fish. Does not a father give food to his children? Besides fish, you can hunt, gather roots and berries. Besides it says you shall not drink whiskey and does not a father prevent his children from drinking the fire water?
There is no dispute that the United States negotiators intended to act in good faith towards the Indians; thus, the Court cannot view the paternal tone as a strategic negotiating tactic, or as a form of sharp dealing. And, indeed, there were specific, tangible promises made by the United States to back up its paternal tone.
The one significant promise for purposes of this litigation is the promise by the United States to the Indians that they would enjoy a permanent right to fish as they always had. This right was promised as a sacred entitlement, one which the United States had a moral obligation to protect. The Indians were repeatedly assured that they would continue to enjoy the right to fish as they always had, in the places where they had always fished. There is no indication in the minutes of the treaty proceedings that the Indians were ever told that they would be excluded from any of their ancient fisheries.
The second most striking aspect of the treaty minutes is an absence of protest over the loss of shellfishing rights. It is clear from the treaty minutes that with respect to fishing rights in general, the guarantee of fishing rights was a sine qua non of the Indians' participation in the Treaties. The Indians repeatedly raised concerns that they *1436 would not survive if they did not have access to their ancient fisheries. Juxtaposed with these expressions of concern, and demands for continued fishing rights, is an absolute silence regarding the Shellfish Proviso. The evidence indicates that the Treaties were read and explained section by section to the Indians during the negotiation process. Yet the minutes reveal no instance where the Indians resisted the Shellfish Proviso.
Thus, the minutes of the treaty negotiations to some extent undermine the interpretations offered by the Defendant and the intervenors. Whether "staked" is taken literally to mean the planting of stakes in the tideland, or taken figuratively as the claiming of private property, it would provide a means for settlers to exclude the Indians from natural shellfish beds where the Indians had always taken shellfish. This is simply inconsistent with the statements made by the United States and the absence of protest from the Tribes, both of which are reflected in the treaty minutes.
If the Shellfish Proviso merely operated to exclude Indians from artificial beds, it would not likely have been a serious point of contention during the negotiation process. As a result, this interpretation is perfectly consistent with the United States' solemn promise that the Indians would have a permanent right to their ancient fisheries.

b. The Shellfish Proviso Viewed in Light of the Historical Circumstances Surrounding the Negotiation of the Stevens Treaties
Just as the record of the treaty negotiations is direct evidence of the parties' intentions, the historical circumstances surrounding the negotiation process are indirect evidence. These circumstances provide the Court with additional information to determine the meaning of the Shellfish Proviso.

i. The United States' Purpose In Entering Stevens Treaties
The United States' motivation for entering into the Stevens Treaties was examined in Washington I, in Fishing Vessel, and by this Court based upon the evidence presented in this sub-proceeding. The United States' primary purpose was to extinguish the Indians' title to the lands in Western Washington, thereby clearing the way for settlement by Europeans. It was hoped that, by moving the Indians onto reservations, the Treaties would minimize the friction and permit amicable relations between the settlers and the Indians. Of course, the United States recognized that to achieve its primary purpose, it would have to pay some price. Further complicating matters, however, was the fact that the United States wanted to execute the Treaties as quickly as possible.
The United States was aware that the Indians used and relied on fish, including shellfish, for subsistence, ceremonial and commercial purposes; thus it was clearly necessary to preserve the Indians' fishing rights. In fact, the United States viewed this concession as serving its own interests to some extent: indeed, the treaty negotiators did not want the Indians to become dependent upon the United States for their subsistence and a reservation of fishing rights would insure against this possibility. At the same time, the United States believed that guaranteeing the Indians fishing rights would "not in any manner interfere with the rights of citizens." Finally, the United States intended to act honorably towards the Indians, and the negotiators believed that it never could have been the intention of Congress that the Indians should be excluded from their ancient fisheries and expressed among themselves the intention to preserve Indian fishing rights.
Overall, the Tribes' interpretation of the Shellfish Proviso is most consistent with the United States' purposes in entering the Stevens Treaties. The interpretation does not in any way conflict with the historical findings of fact concerning the United States' purpose in entering the Treaties. The defendant and the intervenors point to the potential conflict arising from enforcing the Tribes' interpretation of the Shellfish Proviso, and on that basis argue that the Tribes' interpretation contradicts the United States' intention to avoid conflict between Indians and settlers. The United States, however, did not intend that the Indians would relinquish their ancient fishing rights on demand by *1437 settlers. Further, under the Tribes' interpretation, there would be no conflict between Indians and settlers, so long as the Indians respected the settlers' planted oyster beds and the settlers did not stake out natural oyster beds where the Indians took fish.
The Defendant's and intervenors' proposed interpretations are also generally consistent with the United States' purposes in entering the Treaties, except in one important respect: neither of these interpretations is consistent with the United States' avowed intention to preserve for the Indians their ancient fisheries. Whether "staked" is viewed literally or in its frontier sense, it permits the gradual exclusion of Indians from natural shellfish beds, a result clearly unwanted and unintended by the parties to the Treaties.

ii. The Tribes' Purpose In Entering Stevens Treaties
The evidence indicates that the Tribes' purpose in entering the Stevens Treaties was to secure land and livelihood for their members who faced an aggressive wave of European settlement. Tribal leaders and members believed that without recourse to their ancient fisheries, they would perish. Whatever land concessions they made, the Indians viewed a guarantee of permanent fishing rights as an absolute predicate to entering into a treaty with the United States.
Under the Tribes' interpretation the Indians would have a permanent right of access to their ancient fisheries. Conversely, the defendant's and intervenors' proposed interpretations of the treaty simply do not recognize that the Indians were bargaining for a permanent right; rather, they seem to rely on the proposition that the Indians believed that their need for shellfish would diminish over time. This supposition, however, lacks any evidentiary support and is contradicted by the overall weight of the evidence. Accordingly, the Tribes' position is more consistent with this facet of the Treaties' historical context.

iii. The United States' Vision for the Washington Territory
The parties agree that Governor Stevens was not a short-term thinker who was motivated solely by considerations of expediency. Both sides characterize Stevens as a self-conscious historical actor who proceeded cautiously, guided by a vision for the future of the Washington Territory. The parties even agree on some aspects of the substance of Stevens' vision for the Washington Territory; not surprisingly however, on other aspects, they sharply disagree. The Court must resolve these differences in its attempt to recreate Stevens' vision as part of the overall context in which to interpret the Shellfish Proviso.

A. Shellfish Industry in the Washington Territory
First, the parties agree that Stevens envisioned the development of a thriving oyster farming industry in the Puget Sound. Dr. Richards, an expert for the defendant and intervenors, gave the following testimony at trial:
Q. Do you have any opinion as to whether or not Stevens and his treaty commissioners envisioned similar industries [as to those in Shoalwater Bay] developing in the Puget Sound area?
A. I'm sure they did. The newspapers, particularly the Pioneer and Democrat, mentioned the possibility of this occurring and in fact reflected some dismay that it had not occurred already.
But certainly I think it is safe to say that they envisioned the shellfish industry as well as many other industries appearing in the territory on the Sound.
The Tribes' interpretation is most consistent with this vision. The oyster farming industry, as constituted at treaty time, was built on artificial beds. As previously discussed, transplanting oysters from natural beds and seeding artificial beds were the principal method of oyster culture at treaty time, both on the East Coast and at Shoalwater Bay. Stevens' vision of the oyster industry most likely conformed to existing practices; indeed, the record is devoid of any evidence that Stevens or any of the United States' negotiators held any ideas of reforming industry practices. Thus, to protect the fledgling oyster industry, Stevens might have *1438 felt it necessary to exempt artificial beds from the Indians' treaty right to take fish. Under the Tribes' interpretation, the Shellfish Proviso is narrowly tailored to do just that.
Under the competing interpretations, the Shellfish Proviso is not designed specifically to protect the oyster industry; depending on the circumstances, it could either aid or hinder the industry's development. To the extent it prohibited Indians from taking shellfish from both artificial and natural shellfish beds where settlers were engaging in fruitful harvesting, it would aid the development of the industry. However, both the literal and figurative interpretation of "staked" advanced by defendant and the intervenors protect activities, such as tideland ownership, wholly unrelated to the oyster industry. Under either interpretation, a settler  either by placing stakes or by claiming ownership to a tideland parcel  could preclude Indians and non-Indians from taking shellfish from natural beds located on that parcel. The settler could then fail to harvest the shellfish, and the Indians would be forbidden from fishing there. Under these circumstances, it would not foster, but instead undermine, the development of an oyster industry. Accordingly, the Tribes' proposed interpretation is preferable because it is wholly consistent with the notion of fostering the shellfish industry.

B. Tideland Development in the Washington Territory
The parties also agree that the United States negotiators anticipated industrial and urban development in the relevant geographical area, and expected that mills, ports and eventually cities would be erected on the tidelands. Indeed, prior to treaty time, the United States engaged in numerous projects to develop the tidelands, including diking and reclamation of land, and dredging and channelization of watercourses.
The effect of development on the Shellfish Proviso is one of the most perplexing issues in this case. The Tribes have not claimed a right to take shellfish from areas where natural beds no longer exist, such as from tideland areas housing factories, the Kingdome, and mills and ports. The Tribes appear to have conceded that the some of the development along the tidelands, but not all, has extinguished their right to take fish from those particular areas. The only type of development that extinguishes the Tribes' right to take shellfish, however, is that development which also extinguishes the shellfish beds. Thus, in any area, where natural shellfish beds remain  regardless of whether the area is privately owned or leased and regardless of the activity occurring upon the land  the Tribes' right to take fish remains.
What, then, of Isaac Stevens' vision? Stevens did not perceive a conflict between his vision of tideland development and his desire to preserve the Indians' aboriginal fishing rights. First, the United States negotiators believed that the supply of fish, including shellfish, was abundant and seemingly inexhaustible. It appeared unlikely that tideland development would prejudice, in a tangible way, the Indians' right to take fish. Second, the United States negotiators were aware of the thriving shellfish industry in fully-developed East Coast cities, and likely assumed based on those examples that development in the Puget Sound and on the western shore would not interfere with the Indians' exercise of their treaty fishing rights. Consequently, neither the prospect nor the fact of development counsel against the Tribes' interpretation of the Shellfish Proviso.

C. Role of the Indians in the Washington Territory
The State of Washington points out that the Stevens Treaties were negotiated during a period in which the United States adopted an "assimilation policy" towards Indian Tribes. In Washington I, the Court found that, at least with respect to the non-coastal tribes, the United States did envision an assimilation of Indians into western society:
It was the intention of the United States Government, in negotiating Treaties with the Indians, to make at least non-coastal tribes agriculturists, although not restrict them to that, to diversify Indian economy, to teach western skills and trades to the Indians and to accomplish a transition of the Indians into western culture. There was no intent, however, to prevent the *1439 Indians from using the fisheries for economic gain.[19]
Overall, the evidence presented in this case indicates that the United States intended that Indians would, at minimum, interact with settlers in the Washington Territory, if not fully integrate with them. It is clear from the record that the United States intended that the Indians would continue to provide labor and to participate in the regional economy after the Treaties were signed and that the Indians would supply fish, including shellfish, to the settlers. The record in this case does not support the contention that, with respect to the Stevens Treaties, the United States intended to break down tribal affiliations of the Puget Sound Tribes and absorb the tribal members as individuals.

D. Private Ownership of Undeveloped Tidelands
There is no evidence in the record that Isaac Stevens or any of the negotiators from either side foresaw private ownership of the vast majority of tidelands and beaches of Puget Sound and western Washington.
Even if the parties anticipated the massive alienation of tidelands that occurred at the turn of the century, it does not follow that they would have expected private ownership of tidelands to have depleted or subtracted from the public fishery. To the contrary, the uniform common law at treaty time held that private ownership of a parcel of tideland did not include private rights to the shellfish on that parcel. In his 1847 Treatise on the Right of Property in Tide Waters, Joseph Angell opined that "[t]here is no doubt, that the public have a right to take shellfish on the shore, though the right of soil in the shore happens to be private property."[20] Therefore, the treating parties did not view development as vacating the public's, nor the Indians,' right to fish.

c. The Shellfish Proviso Viewed in Light of Post-treaty Conduct by Both Parties
The parties' post-treaty conduct is particularly instructive as to the meaning ascribed to the Shellfish Proviso by the parties themselves. A party's conduct manifests its interpretation of particular language and is, therefore, evidence of their intentions.

i. Conduct of the United States
The State of Washington and the intervenors point to four aspects of the United States' conduct which, they argue, support either a literal interpretation of "staked" or an interpretation of "staked" as meaning "claimed as private property." These four aspects involve development by the United States, actions of the territorial legislature, the failure of the United States to object to the land policy of the State of Washington, and a 1905 decision of the Commissioner of Indian Affairs.

A. Development by the United States
The evidence is undisputed that the United States participated in the building of forts and navigation channels. Indeed, the Tribes' expert admitted that the United States expected that there would be extensive development of the tidelands.
As discussed above, however, it appears that the anticipation of development on the tidelands was a phenomenon entirely unrelated to the crafting of the Shellfish Proviso. The evidence and reasoning supporting that proposition leads to a similar conclusion with respect to the United States' post-treaty conduct: because the United States viewed shellfish resources as exceptionally abundant, and because the United States was aware of thriving shellfishing operations in fully developed cities, it presumably did not view its participation in post-treaty tideland development as a derogation of the Indians' right to take fish. This conduct, then, does not weigh in favor of the defendant's and intervenor's proposed interpretation.

*1440 B. Actions of the Territorial Legislature

The State of Washington and the intervenors also point to the actions of the United States Territorial Government in the period between the signing of the Treaties and Washington's admission to the Union. The evidence indicates that the United States territorial legislature granted a parcel of tideland in the Totten Inlet to private owners in 1864. Furthermore, it was the territorial legislature, not the State of Washington, that first allowed citizens the exclusive use of natural oyster beds in 1879.[21]
Evidence of the actions of the territorial legislature does tend to support the interpretations of "staked" and "cultivated" offered by the defendant and the intervenors. The Court considers it significant, however, that neither of these dispositions occurred until ten years after the signing of the Treaties; furthermore, the 1879 Act, which represents the first substantial step in privatizing the tidelands, did not occur until 25 years after the Treaties had been signed. Accordingly, the weight of this evidence in support of the defendant's and the intervenors' interpretation is reduced by the passage of time between the signing of the Treaties and these actions of the territorial legislature.

C. The Failure of the United States To Object to the Land Policy of the State of Washington
The third aspect of the United States' post-treaty conduct cited by the State and the intervenors is the United States' silence while Washington executed its policy of alienating tideland parcels to private owners. Washington became a state in 1889, and in 1895 it passed legislation (the "Bush" and "Callow" Acts) for the private purchase of tidelands, even when those tidelands contained natural shellfish beds. There is no evidence that the United States intervened on behalf of the Indians, by threat of litigation or otherwise, when the legislation was passed in 1895.
This evidence, like the acts of the territorial legislature, tends to support the interpretation offered by the State and the intervenors. Again, however, the probativeness of this evidence is considerably weakened by its remoteness in time from the execution of the Treaties. The passage of the Bush and Callow Acts, and the United States' subsequent inaction, did not occur until forty years after the Stevens Treaties were signed. It should further be noted that neither the Territory nor the State of Washington could terminate pre-existing federal treaty rights by simply selling the land in which those rights existed.

D. 1905 Decision by the Commissioner of Indian Affairs
Finally, Defendant and the intervenors argue that a 1905 letter-opinion by the Commissioner of Indian Affairs reflects a broad interpretation of the Shellfish Proviso by the United States. In 1905, Harry Liston, the Superintendent of the Puyallup Indian Agency, wrote a letter to the Commissioner of Indian Affairs relaying a complaint from the S'Klallam Indians seeking advice.[22] The S'Klallams complained of their recent exclusion from their usual and accustomed clam digging areas by three men claiming to have leases to the tidelands.[23] In response, the Commissioner responded that
it is the opinion of this office that such lands are under the control and jurisdiction of the State; that the Indians should not be permitted to trespass upon the tide lands leased from the State; that in case they desire special privileges as to the digging of clams from the tidelands referred to, it will be necessary for them to lease the same from the State of Washington ... However, if there are tide lands used in common by the citizens of that region, the Indians, under said article IV, *1441 have the right to take fish, clams, etc. from such lands.[24]
This correspondence has no relevance to the appropriate interpretation of the Shellfish Proviso. It is absolutely clear from the underlined portion of the Commissioner's letter that he based his opinion on the belief that the Indians' treaty could only be exercised on "in common" lands; his letter makes no mention of the Shellfish Proviso as a basis upon which Indians could be excluded from the leased tidelands. Moreover, this opinion was voiced nearly a half century after the Stevens Treaties were signed.
In sum, the United States' relevant post-treaty conduct does not strongly support the interpretation advanced by the State of Washington and the intervenors. Granted, the cited conduct points to gradual erosion of the Indians' fishing rights; however, the fact that these rights became decimated over time does not imply that they did not exist in the first instance.

ii. Conduct of the Signatory Tribes
The State and the intervenors also rely on the Indian response to the Bush and Callow acts to support their interpretation. The evidence indicates that some individual members of the plaintiff Tribes purchased tidelands under the Bush and Callow Acts. Furthermore, the record contains only one instance of Indian protest regarding the alienation of tidelands by the Territorial Government and the State of Washington. That one example, cited by Plaintiff's expert, Dr. White, is the complaint of the S'Kllalam tribe that precipitated the 1905 letter opinion by the Commissioner of Indian Affairs.
The purchase of tideland by individual Indians, however, has little if any probative value, as to the meaning of the Shellfish Proviso. No evidence exists that these individuals' actions were taken pursuant to their understanding of the Shellfish Proviso; rather, the evidence indicates that these individuals were simply responding to a massive land rush and taking all possible steps to safeguard their access to fish and their personal self-interests.
Thus, the proffered evidence of the Tribes' post-treaty conduct does not weigh heavily in favor of the defendant's and intervenors' proposed interpretations.

d. Conclusion
The Court interprets the terms "staked" and "cultivated" as the terms were defined and used in the shellfishing industry at and before treaty time. At treaty time, the term "cultivate" was defined in the shellfish context by Ingersoll as an activity occurring only on artificial beds. In addition, consistent with the virtually uniform body of state statutes and common law, the activities of "staking" and "cultivating" occurred only on artificial beds. When the parties used these terms in the Shellfish Proviso, they intended only to exclude Indians from artificial, or planted, shellfish beds; they neither contemplated nor desired that the Indians would be excluded from natural shellfish beds.
Therefore, the words "any beds staked or cultivated by citizens," describe artificial shellfish beds created by private citizens. Moreover, at treaty time, artificial beds contained shellfish deposited for either growing or storage purposes, and were surrounded by stakes or other markers to the extent that they did not interfere with navigation. Thus, clearly, as has been explained, the intervenor growers' farms, which are artificial beds as herein described, are "staked or cultivated," as that clause has been interpreted by the Court. Such beds are not subject to fishing by the Tribes, except to the extent that natural clam beds may be subjacent to the staked or cultivated shellfish beds, as explained below. Finally, it is also clear that the intervenor private property owners' natural beds are not "staked or cultivated;" thus natural beds, if any, located on privately owned tidelands, are part of the tribal fishery.
In the preceding sections, the Court evaluated the evidence in accordance with the principles of treaty interpretation established by the Supreme Court. The analysis in those preceding sections overwhelmingly supports the Tribes' proposed interpretation *1442 of the Shellfish Proviso. First, and most importantly, in interpreting the Shellfish Proviso, the Court must focus on what the Indians intended: the record unequivocally reflects the Indians insistence on reserving the right to fish as they always had, and the record is devoid of any objections or concern over their exclusion from ancient shellfish fisheries.
Second, the focus must be on what the Indians understood. Indeed, because only artificially planted beds were "staked" or "cultivated" at Shoalwater Bay, it is unlikely that the Indians would have understood these words to exclude them from natural shellfish beds.
Finally, the focus is on what the United States intended and understood: the interpretation offered by the Tribes is consistent with both the United States' short-term goals and its long-term visions for the Washington Territory.

5. Right of Tribes to Take Naturally-Occurring Clams from Underneath Staked or Cultivated Oyster Beds
The Tribes argue that they also have the right to take 50% of the harvestable naturally occurring clams from the beds that exist underneath many artificial oyster beds. The intervenors, on the other hand, argue that these clam beds fall directly within the ambit of the Shellfish Proviso because the clam beds are "shellfish," and the natural clams will be harvested from beds that are "staked or cultivated," even when using the Tribes' interpretation of the Shellfish Proviso.
Consistent with its interpretation of the other provisions of the Treaties, the Court relies on, inter alia, the historical context of the treaty, the principal that ambiguities must be resolved in the favor of the Indians, and the "reservation of rights" doctrine in order to decide whether clams from natural beds beneath artificial oyster beds may be harvested.
The Court finds that plaintiffs' evidence is more persuasive and demonstrates that, at treaty time, the exclusive rights gained by one who had staked or cultivated an (artificial) oyster bed did not extend to the natural clam beds found beneath. It apparently was a common practice for Indians and other citizens to harvest clams legally[25] from natural clam beds existing beneath artificial shellfish beds; thus it is likely that the Indians understood that this practice would continue, notwithstanding the existence of the Stevens Treaties.

III. THE "SHIVELY PRESUMPTION" AND THE EQUAL FOOTING DOCTRINE
The State of Washington and the intervenors urge the Court to construe the Stevens Treaties in light of the "Equal Footing Doctrine" and the "Shively presumption." Under the Equal Footing Doctrine, every new state is entitled to entrance into the Union free of any encumbrance on its land, *1443 so that it stands on "equal footing" with the other states. Shively v. Bowlby, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331 (1894). The "Shively presumption" is an outgrowth of this doctrine, and holds that any pre-state-hood grant of property does not include tidelands unless the grant clearly indicated that tidelands were included. See United States v. Holt State Bank, 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 (1925).
In sum, their argument under the Equal Footing Doctrine is that any treaty right to harvest shellfish would amount to a property interest in the tidelands and since the treaty does not clearly specify an intent to grant a property interest in the tidelands, under the Shively presumption, the treaty cannot be construed as providing a right to harvest shellfish, or, alternatively, that the Shellfish Proviso must be broadly construed. For the reasons set out below, the Court rejects this argument and interprets the Stevens Treaties without regard to the Equal Footing Doctrine or the Shively presumption.
First, the Equal Footing Doctrine cannot be applied to rights reserved by the Tribes. It is clear that in Holt State Bank and Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Supreme Court viewed the disputed fee title rights to lands underlying navigable waters as reserved by the United States before the subject treaty was made. Both cases frame the issue in terms of whether the United States "conveyed" or "disposed of" its fee title rights. See Holt State Bank, 270 U.S. 49, 57, 46 S.Ct. 197, 200 (1925); Montana v. United States, 450 U.S. 544, 550-51, 101 S.Ct. 1245, 1250-51, 67 L.Ed.2d 493 (1981). In Holt State Bank, the Court found "there was nothing in [the Treaties] which even approaches a grant of rights in lands underlying navigable waters." Holt State Bank, 270 U.S. at 58, 46 S.Ct. at 200. In Montana, the Court held that the treaty "did not by its terms formally convey any land to the Indians at all." Montana, 450 U.S. at 553, 101 S.Ct. at 1248. Implicit in these conclusions is a finding that, prior to the respective Treaties, the United States held fee title to the beds of Mud Lake and the Big Horn River.
The reasoning in Holt State Bank and Montana is consistent with the concept of "aboriginal title" or "Indian title," first articulated by Chief Justice John Marshall in Johnson v. M'Intosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). In Oneida Indian Nation v. County of Oneida, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974), the Supreme Court explained "aboriginal title:"
It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign  first the discovering European nation and later the original States and the United States  a right of occupancy in the Indian tribes was nevertheless recognized.
Id. at 667, 94 S.Ct. at 777. See also Lac Courte Oreilles Band, Etc. v. Voigt, 700 F.2d 341, 351 (7th Cir.1983) (distinguishing between "treaty-recognized title," and right of permanent occupation, and "aboriginal title," which could be extinguished at any time by the United States). Thus, the Court in Holt State Bank and Montana properly viewed permanent fee title to the river and lake beds as held by the United States.
The paradigms of Holt State Bank and Montana, however, simply are not present in the case before this Court  the analysis in those cases, and their reliance on the Shively presumption, is inapplicable because, here, the Indians possess the disputed rights pretreaty, and the treaty simply effects a reservation of rights. It is settled under Washington II that the fishing rights at issue in this case predated the Stevens Treaties, and the Treaties simply effected a reservation of those rights. See Washington II, 520 F.2d at 684. Similarly, the Supreme Court acknowledged the reservation in Fishing Vessel: "The fishing clause speaks of `securing' certain fishing rights, a term the Court has previously interpreted as synonymous with `reserving' rights previously exercised." Fishing Vessel, 443 U.S. at 678, 99 S.Ct. at 3071. Because the Stevens Treaties must be construed as a reservation of rights by the Tribes, not a granting of rights by the United States, the Shively presumption and the Equal Footing Doctrine cannot play a role in *1444 the evaluating the existence or scope of the rights.
In addition, the Supreme Court has applied the Equal Footing Doctrine in one context only, namely when evaluating a claim of right to lands beneath navigable waters based upon an alleged conveyance or retention of fee simple ownership by the United States prior to statehood. See Shively, 152 U.S. at 2, 14 S.Ct. at 548 (defendants were successors to "owners of a donation land claim, as laid out and recorded by [the predecessor in interest] under the act of congress.... commonly knows as the `Oregon Donation Act,' embracing the then town and much of the present city of Astoria"); Montana, 450 U.S. at 550-51, 101 S.Ct. at 1250-51 ("The question is whether the United States conveyed beneficial ownership of the riverbed to the Crow Tribe by the Treaties of 1851 or 1868"); Holt State Bank, 270 U.S. at 57, 46 S.Ct. at 199-200 (adjudicating the question of "whether the lands under the lake were disposed of by the United States before Minnesota became a state"); Utah Division of State Lands v. United States, 482 U.S. 193, 204, 107 S.Ct. 2318, 2324, 96 L.Ed.2d 162 (1987) (The United States answered in the District Court that title to the lakebed remained in federal ownership by selection of the lake as a reservoir site prior to Utah's statehood). The Court has never applied the doctrine in the context of a claim of right based on an alleged pre-statehood reservation of fishing rights, and lower courts have followed the pattern of the Supreme Court.[26]
The case before this Court is a dispute that does not in any way involve ownership of tidelands. The Tribes do not claim ownership of tidelands today, nor is the Tribes' based upon an alleged pre-statehood conveyance of ownership of the tidelands. At stake in this case are shellfishing rights, and there is no Supreme Court or other authority that would justify application of the Equal Footing Doctrine in this context.
Finally, the Equal Footing Doctrine cannot form the Court's interpretation of the Treaties' language concerning the right to fish in general. The "right of taking fish" has been interpreted in both Winans[27] and Fishing Vessel without incorporation of the Shively presumption. While it is true that Winans discusses the Equal Footing Doctrine, it does not discuss Shively in the context of interpreting the treaty. Rather, the discussion of the Equal Footing Doctrine in Winans is distinct from its interpretation of the treaty, and can be regarded as dicta addressing the "subsidiary contentions" of the defendants in that case. Moreover, in Fishing Vessel, the Court makes no reference at all to the Equal Footing Doctrine.[28]
The State of Washington and the intervenors have not explained why this Court, unlike its predecessors, should, for the first time, incorporate the Shively presumption into its analysis of the Shellfish Proviso. This case is not the first, as the State of Washington and the intervenors argue, to implicate property rights. The Court in Winans upheld the Indians' right to cross private property to take fish. Winans, 198 U.S. at 381 ("[T]he Indians were given a right in the land  the right of crossing it to the river  the right to occupy it to the extent and for the purpose mentioned."). Furthermore, the right to take salmon and steelhead, upheld in Washington II and Fishing Vessel, includes the right to use private tidelands for beach seines, tidal impoundment traps, stake nets and reef nets. Nevertheless, the Equal *1445 Footing Doctrine was rejected by this Court in Washington I and ignored by the Supreme Court in Fishing Vessel. There is no reason why this Court should now take a different tack in interpreting the fishing clause.
In sum, the Court interprets the words of the Stevens Treaties in light of the specific principles of construction applicable to Indian Treaties and concludes that fishing rights are rights reserved by the Tribes and not granted to them. The Court construes both the Fishing Clause, in general, and the Shellfish Proviso, in particular, without regard to the Shively presumption.

IV. MODERATE LIVING DOCTRINE
Assuming that the Tribes' interpretation must prevail, the defendant and the intervenors argue that, in order to maintain a "moderate living," the Tribes do not need to exercise any treaty entitlement to the shellfish. The Tribes, however, argue that the evidence does not support any reduction in their tribal share.

A. Fishing Vessel and the Moderate Living Doctrine
The right to take fish "in common with" other citizens entitles the Tribes not only to equal access to the fish, but also to an allocation, or "fair share," of the harvestable fish runs.[29] The Supreme Court devised a formula by which a "fair share" of the available fish may be calculated, generally providing that the harvestable fish passing through the usual and accustomed places will first be equally divided.[30] Under the Moderate Living Doctrine, this equal amount, however, may be reduced if tribal needs could be satisfied by a lesser amount. The Supreme Court found that the 50% amount could be reduced if substantial changes in circumstances had occurred, such as if the Tribe has dwindled to only a few members, or if the Tribe had voluntarily abandoned its fisheries. Fishing Vessel, 443 U.S. at 685-87, 99 S.Ct. at 3074-75. Thus, in Fishing Vessel, the Supreme Court found that the 50% amount is the maximum, but not the minimum, that the Indians are to be allocated, namely the Tribes are to be allocated only that portion which will provide them a "moderate living." 443 U.S. at 685-86, 99 S.Ct. at 3075.

B. The Moderate Living Doctrine in this case
The Court finds that no persuasive evidence has been presented to the Court by the State and the intervenors showing that a substantial change in circumstances has occurred,[31] so that the Tribes could maintain a moderate living without the exercise of their fishing rights, or that the Tribes have voluntarily abandoned their fisheries. Therefore, the Court declines to apply the Moderate Living Doctrine to these facts.
The State of Washington and the intervenors' argued at trial that the Court should engage in an economic discussion about the income levels of the tribal members in order to prove that the circumstances of the Tribes have changed to such a degree so as to *1446 warrant a reduction in the Tribes' share of shellfish.
The State's and intervenors' expert, Dr. Thomas, however, admitted that "moderate living" is not a term of art used by economists. The defendant and intervenors, through the income driven analysis of their expert, seek to prove that the Tribes already derive income from a variety of sources; thus the Tribes do not require a 50% share of the shellfish in order to maintain their "moderate living." Dr. Thomas relied solely on what he called "tribal household income"[32] and compared it to a moderate living standard by reference to the Bureau of the Census income data for non-Indian households.
Dr. Thomas' argument is flawed because it relied only on income, namely it was a single-indicator analysis. A more appropriate analysis, such as the analysis of the Tribes' expert Dr. Meyer, focuses on a several relevant factors in order to determine if the circumstances of the Tribes have changed to such a degree so that a reduction in the tribal share of shellfish is warranted. The uncontroverted evidence presented at trial is that the Tribes lag significantly behind other residents of the State of Washington in their overall standard of living. For example, approximately one in three Tribal members live below the poverty level; Indians in the State of Washington endure health circumstances characterized by the State as "very poor;" tribal members have per capita incomes that are less than one-half the per capita income of non-tribal residents of the State; and tribal members suffer from unemployment rates at least three times greater than that of all non-tribal residents of the State of Washington.
Therefore, the Court declines to apply the Moderate Living Doctrine to reduce the Tribes' share of harvestable fish on the basis that they already derive a sufficient income and standard of living from other sources.

V. AFFIRMATIVE DEFENSES

A. Time-Related Defenses: Laches, Waiver, Estoppel and Adverse Possession
As a last line of defense, the defendant and intervenors suggest that the Tribes have, in various ways, forfeited their shellfishing rights. It is clear, however, that the intervenors have no basis for asserting time-related defenses in this action. The Supreme Court and the Ninth Circuit have consistently held that time-related defenses such as latches, waiver, estoppel, and adverse possession are not available to defeat Indian treaty rights. See Board of Comm'rs v. United States, 308 U.S. 343, 350-51, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939) ("[S]tate notions of latches and statutes of limitations have no applicability to suits by the Government, whether on behalf of Indians or otherwise." (citations omitted)); Swim v. Bergland, 696 F.2d 712, 718 (9th Cir.1983) (defenses not available "even where the Indians have long acquiesced in use by others of affected lands or have purported to grant away their occupancy and use rights without federal authorization."); Catawba Indian Tribe of South Carolina v. State of South Carolina, 865 F.2d 1444, 1448 (9th Cir.1989) ("Except where Congress provides otherwise, clams based on Indian title are not subject to state law defenses such as statutes of limitations, adverse possession or laches.")
Accordingly, this Court summarily adjudicated the non-viability of these defenses.

B. Extinguishment by Indian Claims Commission Payments
Intervenor UPOW argues that the claims of many of the plaintiff Tribes to fishing rights under the Stevens Treaties have been extinguished by prior payments made to those Tribes pursuant to the Indian Claims Commission Act, 25 U.S.C. § 70 ("ICCA"). This argument has no merit.
*1447 It is true that the primary purpose of the ICCA was "`to dispose of the Indian claims problem with finality.'" United States v. Pend Oreille Public Utility District No. 1, 926 F.2d 1502, 1508 (9th Cir.1991) (quoting United States v. Dann, 470 U.S. 39, 45, 105 S.Ct. 1058, 1062, 84 L.Ed.2d 28 (1985)). However, the Indians have never had a claim against the United States for lost fishing rights, because the Indians expressly reserved their fishing rights in the Stevens Treaties. Instead, the claims resolved by the ICC were claims for compensation based on the unconscionable sum provided in the Treaties in exchange for the Indians cession of their lands.
UPOW's citation to Western Shoshone National Council v. Molini, 951 F.2d 200 (9th Cir.1991) is inapposite. In Molini, the Claims Commission paid the Western Shoshone Tribe $26 million for "full title extinguishment." The Ninth Circuit found held the "full title extinguishment" was an "unqualified transfer of title" that "include[d] a transfer of hunting and fishing rights." Id. at 203. In this case, the Tribes expressly reserved their fishing rights in the Treaties. The taking away of fishing rights occurred not pursuant to the Treaties, but in derogation of the Treaties. The payments awarded by the Commission to the Tribes were in compensation for the cession of the residual portions of their aboriginal title under the Stevens Treaties. The Commission had no obligation to compensate for lost fishing rights, because the Stevens Treaties did not divest the Tribes of fishing rights.

VI. YAKAMA TREATY
The treaty with the Yakamas[33] contains no language similar to the shellfish proviso which is part of the other Stevens Treaties. If the Court were to interpret the Yakama treaty in a vacuum, it would be difficult to determine whether the treaty "right to take fish" encompassed shellfish. The existence of the Shellfish Proviso in the other Stevens Treaties leaves no doubt that fish encompasses shellfish in those Treaties. However, an equally compelling rationale, which applies to the Yakama treaty as well as the other Stevens Treaties, is that the "right of taking fish" is a reservation of preexisting fishing rights, and those pre-existing rights include the right to take shellfish.
The Yakama Treaty, however, cannot be construed in a vacuum; it must be analyzed in light of the other Stevens Treaties. The Court recognizes that the Yakamas, like the other Tribes, enjoy the benefit of the canons of construction favoring Indians and would not infer a limitation on the "right of taking fish" without compelling evidence. The timing of the Yakama treaty, the absence of a Shellfish Proviso, and the scant evidence of any shellfishing activity of the Yakama tribe at or before treaty time is compelling evidence that the Yakama's "right of taking fish" does not include shellfish.
First, based on the timing of the treaty and the absence of the Shellfish Proviso, it is clear that the United States did not intend that the Yakamas would reserve shellfishing rights. The treaty with the Yakamas was concluded after the other Stevens Treaties, and it is reasonably clear that the United States, had it contemplated Yakama shellfishing, would have wanted similarly to protect "staked or cultivated beds" from fishing by the Yakamas. Because the United States did not include a Shellfish Proviso, it is reasonable to conclude that the United States did not contemplate that the Yakamas were reserving the right to harvest shellfish.
Moreover, the evidence introduced at trial indicates that it is unlikely that the Yakamas, when they entered the treaty, expected that they were reserving the right to harvest shellfish. The Yakama tribe lived, not in the Puget Sound region, but rather in the eastern Washington plateau. When asked whether she had an opinion as to what were the Yakamas' usual and accustomed grounds and stations in Western Washington, the Yakamas expert answered "No, I do not." The evidence indicates that any use individual Yakamas made of shellfish in Western Washington prior to the Treaties was based upon marriage into Puget Sound Tribes.
Therefore, the Court finds that the Yakama Tribe did not reserve a right to harvest *1448 shellfish when it entered into the treaty with the United States.

VII. SUCCESSORSHIP OF THE UPPER SKAGIT TRIBE TO THE NUWHA'HA AND THE BSIGWIGWILTS
The Upper Skagit Tribe argues that, since it is the successor of the treaty bands the Nuwha'ha and the Bsigwigwilts, it is also the successor of the rights held by the Nuwha'ha and the Bsigwigwilts with respect to the right to take shellfish. The State of Washington alone contests the political successorship of the Upper Skagit Tribe to the Nuwha'ha and the Bsigwigwilts.
Whether or not a particular group of persons has descended from a treaty signatory and has maintained an organized tribal structure is a question of fact which a district court is competent to determine. Washington II, 520 F.2d at 693. Furthermore, once a group is found to be the successor in interest to a treaty signatory, that group's rights under the treaty may be "lost only by unequivocal action of Congress." Id., quoting Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968).

A. Successorship of the Upper Skagit Tribe

1. Successors to the Bsigwigwilts.
The Court finds that the Bsigwigwilts Tribe was previously adjudicated as the predecessor of the Upper Skagit. Thus, the Upper Skagit have the right to take fish from the usual and accustomed places of the Bsigwigwilts.
Washington I referenced and incorporated the Indian Claims Commission proceeding which had been brought by the Upper Skagit to adjudicate the issue of their predecessors-in-interest. See Washington I, 384 F.Supp. at 379; 8 Ind.Cls. Comm'n 475, 476-77 (Ddt. No. 92, March 25, 1960). In that proceeding, the ICC found that ten groups, including the Bsigwigwilts, were the predecessors of the Upper Skagit. Although the spelling of the Bsigwigwilts was different in the Indian Claims Commission proceeding; this Court is satisfied with the uncontroverted expert testimony presented at trial which accounted for the variations in the modern spelling.[34]

2. Successors to the Nuwha'ha
The issue of the successorship of the Upper Skagit to the Nuwha'ha is somewhat more involved because the Nuwha'ha were not identified by the Indian Claims Commission proceeding and subsequently incorporated into Washington I as one of the predecessor groups of the Upper Skagit.
As a preliminary matter, it is clear that the tribe or group asserting the successorship bears the burden of proof on this issue. Lummi Indian Tribe, 841 F.2d 317, 318 (9th Cir.1988). Moreover, to acquire the rights of a treaty signatory tribe, a contemporary tribe must obtain "treaty tribe status." United States v. Washington, 641 F.2d 1368, 1370-71 (9th Cir.1981). For the Upper Skagit to obtain such status, it must demonstrate that a percentage of its members have descended from a treaty signatory and that the Tribe has maintained an organized tribal structure, including some defining characteristic of the original tribe. Id. at 1372-73.

a. The Suquamish Test
The State of Washington argues that the Court should not apply the United States v. Washington test described above, but instead should apply the test set forth in United States v. Suquamish Indian Tribe, 901 F.2d 772 (9th Cir.1990). In Suquamish, the Ninth Circuit held that for one signatory tribe to claim the rights of a second signatory tribe, the plaintiff must show both a consolidation or merger of the tribes and a demonstration that the tribes, together, maintained an organized tribal structure. Id. at 776.
*1449 The facts in this case, however, are clearly distinguishable from the Suquamish case. Specifically, the following differences exist: (1) at issue in Suquamish was the consolidation of two signatory tribes; here, no one has presented evidence that the Upper Skagit itself was a treaty signatory; (2) in Suquamish, the tribes were mobil, hence providing little interaction that would point to a merger; here the Nuwha'ha and other predecessor bands lived before, during, and after treaty time in the same and adjoining watersheds; and (3) in Suquamish, the tribes were hostile to each other; they had no interest in uniting and the United States continued to deal with each group as a separate tribe; here, the Nuwha'ha and the other bands were political allies and shared resources. Consequently, based on these differences, the Court finds the Suquamish test inapplicable to this action.

b. The Washington Test
Having found the Suquamish analysis to be inapplicable to these facts, the Court finds the Ninth Circuit's analysis in United States v. Washington, 641 F.2d 1368 (9th Cir.1981), to be the appropriate test. In that light, the evidence in this case clearly indicates that the Upper Skagit obtained treaty time status, in that it has demonstrated that the requisite percentage of its members have descended from a treaty signatory and that the it has maintained an organized tribal structure, which includes some defining characteristics of the original tribe.
Through the testimony in open Court as well as the reports submitted into evidence, the Upper Skagit demonstrated the necessary facts under the Washington test. First, the Upper Skagit have maintained an organized tribal structure: The Upper Skagit claim a membership of approximately 600 members, and they have a tribal council that is elected from the enrolled members of the Tribe. Second, a percentage of the members of the Upper Skagit have descended from the Nuwha'ha. Specifically, as many as 200 of the 600 current tribal members trace their direct ancestry back to the Nuwha'ha. In addition, many members of the current tribal leadership trace their heritage directly to the Nuwha'ha leadership. Indeed, four members of the present council can trace their heritage back to two of the Nuwha'ha treaty time leaders; furthermore, the present chairman of the Tribe is a direct descendent of Nuwha'ha members who were alive during treaty time. As a result, the Tribe has demonstrated that it is the successor to the Nuwha'ha, under the test set forth in United States v. Washington; thus the Upper Skagit have a viable claim to the treaty fishing rights of the Nuwha'ha, including the shellfishing rights, under the Stevens Treaties.

B. The Usual and Accustomed Areas of the Upper Skagit Tribe
Having concluded that the Upper Skagit has succeeded to the rights of the Nuwha'ha and the Bsigwigwilts, the Court must determine the usual and accustomed areas of these predecessors from which the Upper Skagit may now take fish.

1. Usual and Accustomed Areas of the Bsigwigwilts and other predecessors previously determined in Washington I.
In Washington I, the Court made findings in regard to the usual and accustomed fishing grounds and stations running along the rivers. Thus, the Court need now adjudicate only the usual and accustomed marine areas of the predecessors of the Upper Skagit, including the Bsigwigwilts, the Nookachamps, and the Sabelxu.[35]
The uncontroverted evidence presented at trial through oral testimony and written reports is that these predecessor groups, at and before treaty time, took fish, including shellfish, from the marine and fresh waters, tidelands, and bedlands adjacent and subjacent thereto of the areas along the Saratoga Passage on the east coast of Whidbey Island from Sneatlum Point in the vicinity of Penn *1450 Cove and Harrington's Lagoon to Holmes Harbor, and on Camano Island from Utsaladdy to what is now the vicinity of Camano Island State Park and Elger Bay. In addition, these predecessor groups of the Upper Skagit also fished at the following marine and tideland locations: Deception Pass, Similk Bay, and southward to and including Penn Cove and Utsaladdy. Because the Upper Skagit have succeeded to the interests of these predecessor groups, the Upper Skagit also have the right to take fish from these usual and accustomed grounds and stations.

2. Usual and Accustomed Areas of the Nuwha'ha
The uncontroverted testimony also indicated that the Nuwha'ha, at and before treaty time, took fish, including shellfish, from the marine and fresh waters, tidelands, and bedlands adjacent and subjacent thereto of the vicinity of Bayview on Padilla Bay to the vicinity of Blanchard on Samish Bay up to and including Chuckanut Bay. Thus, because the Upper Skagit have succeeded to the interests of the Nuwha'ha, the Upper Skagit also have the right to fish, including shellfish, from these usual and accustomed grounds and stations.

VIII. ORDER REGARDING IMPLEMENTATION
This opinion interprets the plaintiff Tribes' right to take shellfish under the Stevens Treaties in light of the Shellfish Proviso limiting such right to the taking of shellfish from beds not "staked or cultivated."
Because of the complex issues and competing concerns involved in the implementation of this decision, and because the Court desires to have the benefit of the parties' prior experience in Washington I, the Court defers the issue of injunctive relief or any plan of implementation until there has been input from the parties.
Accordingly, the Court orders the parties to submit a jointly agreed upon plan of implementation on or before January 31, 1995. To the extent that the parties cannot agree on any issue, each party shall submit a separate proposal on such issue, supported by factual or legal grounds. All issues should be included and proposals shall be specific. It is the hope of the Court that all issues can be resolved by the parties through good faith negotiations.
IT IS SO ORDERED.
NOTES
[1] The Tribes active in this sub-proceeding are the following: the Tulalip, Puyallup, Squaxin Island, Makah, Muckleshoot, Upper Skagit, Nooksack, Nisqually, Lummi, Skokomish, Port Gamble S'Klallam, Lower Elwha S'Klallam, Jamestown S'Klallam, Suquamish, Yakama, and the Swinomish (hereinafter "The Tribes"). The Quinault, Quileute, and Hoh Tribes, all coastal Tribes, made appearances in the action; however, they were not active participants, and they sought no relief.
[2] The treaties are called the "Stevens Treaties" because of the participation in the negotiations of all of the treaties by Territorial Governor Isaac Stevens. Each of the Tribes involved in this sub-proceeding are the successors in interest to one or more of the following treaties: Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132); Treat of Point Elliot, January 22, 1855, (12 Stat. 927); Treaty of Point No Point, January 26, 1855 (12 Stat. 933); Treaty with the Makah, January 31, 1855 (12 Stat. 939). Hereinafter "The Treaties."
[3] This language is taken from the Treaty of Medicine Creek; however, the parties admitted that all of the Stevens Treaties contain substantially similar language.
[4] The action was filed originally against the State of Washington. Later in the proceeding the following groups intervened as defendants: the Puget Sound Growers Association; UPOW, the United Property Owners of Washington; and the "Adkins Party," a group of about 20 private property owners. The main representatives of the "Adkins Party" are Adkins, Carter, and Alexander.
[5] The Court does not believe that such a right can be found in the provisions reserving the Indians' right to hunt, gather roots and berries, and pasture horses.
[6] PL-237 at 296.
[7] Id. at 297.
[8] Id. at 297. DeBroca elaborates:

The natural bank may be single or formed of several small banks, separated by greater or less spaces, but always sufficiently connected to be considered parts of one whole. As to places where, through accidental circumstances, isolated oysters have developed, they are not classed among the natural beds, since, if this were the case, the largest part of the submarine soil of the coast would be under interdiction and oyster culture would be impossible. However protective the American laws may be in what concerns public property, they are careful not to interfere with private enterprise by a too rigorous interpretation of the term public property.
DeBroca at PL-297.
[9] See also Angell, Treatise on the Right of Property in Tidewater (1847), PL-428 at 139 ("Oysters.... may be taken and thus become the property of him who takes them, and if he plants them in a new place flowed by tide water, visibly denoted, and where there are none naturally, and for his own particularly benefit, it is not regarded as an abandonment of his property in them.") (emphasis added).
[10] The following laws were passed in the Washington Territory:

(1) An Act for the Preservation of Oysters in Shoalwater Bay, January 13, 1855:
And be it enacted, that it shall not be lawful from and after the first day of June, until the first day of August, yearly, and every year, for any person or persons to rake, scrape, or gather any oysters from any of the oyster beds in Shoalwater Bay under any pretense, whatsoever; Provided, that nothing in this section shall be so construed as to prohibit any persons from taking oysters from beds planted out by him or them.
2. An Act to Encourage the Cultivation of Oysters, January 16, 1861:
Be it enacted.... That any person, being a citizen of this Territory, who has planted, or who hereafter may plant oysters in any bay or arm of the sea, where there are no natural beds of oysters, within or bordering upon this Territory, may acquire, by conforming to the requirements of this act, an exclusive right for such a purpose....
The person desiring the benefits of the preceding section, shall cause the place or portion he desires to claim, to be marked so far as is practicable with stakes or other artificial marks at the corners.... and shall make, before some officer qualified to administer oaths, an affidavit that he has taken the premises so described, for the purpose of planting oysters, and that he has planted, or is about to plant oysters thereon, that said premises are not upon and do not include any natural bed of oysters....
3. An Act to Encourage the Cultivation of Oysters, January 24, 1863. Contains same language as 1861 law.
4. An Act to Encourage the Cultivation of Oysters, November 5, 1873. Contains same language as 1861 law.
5. An act to Amend an Act Entitled An Act to Encourage the Cultivation of Oysters, November 6, 1877. Contains same language as 1861 law.
[11] On the other hand, the Growers point out that in 1864, the Washington Territorial Legislature passed "An Act to Authorize Wm. Horton, Wm. N. Horton and Wm. A. Busey, their Heirs and Assigns to Plant, Cultivate and Gather Oysters on Totten's Inlet." This Act gave the named individuals "the exclusive privilege to plant, cultivate and gather oysters in so much of Totten's Inlet as lies within [designated limits]." Under the terms of this grant, it is possible that the grantees would enjoy private property rights in natural oyster beds. However, the Court does not consider this single grant to three individuals to constitute a significant part of the legal landscape in the Washington Territory.
[12] The following are laws and cases from other states that reflected the general rule of no staking or cultivating of natural beds: An Act Concerning Oysters, April 28, 1851 (Ca.); An Act Regulating and Protecting the Planting of Oysters, June 23, 1855 (Conn.); An Act in Addition to an Act Entitled "An Act for the Growing of Oysters," June 13, 1845 (Conn.); An Act to Encourage and Protect the Planting of Oysters, August 15, 1849 (Maine); An Act Concerning the Planting of Oysters, April 21, 1848 (Mass.); An Act Relative to the Fishery in Certain Waters, 1813 (N.Y.); An Act concerning oysters and terrapins and the penalties in regard to them, March 22, 1847 (Va.); Decker v. Fisher, 4 Barb. 592, 595 (N.Y. 1848).
[13] See PL-428 at 139
[14] See PL-237 at 286, 297
[15] For instance, the following item appeared in Ballou's Pictorial Drawing Room Companion on September 9, 1855:

The oysters here are mostly brought in the spring from the coasts of Virginia and Delaware and are planted about a mile from the shore, the boundaries of each man's plantation being designated by stakes, as shown in our engraving. PL-197.
[16] Gibbs, PL-196 at 465.
[17] PL-236.
[18] PL-234.
[19] Washington I, 384 F.Supp. at 355.
[20] See also Peck v. Lockwood, 5 Day 22 (Conn. 1811); Weston v. Sampson, 62 Mass. 347 (1851); Lakeman v. Burnham, 7 Gray 437 (Mass.1856); Bickel v. Polk, 5 Har. 325 (Del. 1851); Moulton v. Libbey, 37 Maine 472 (1854).
[21] See An Act to Amend an Act Entitled "An Act to Encourage the Cultivation of Oysters," (Approved November 14, 1879), Laws of the Washington Territory, enacted by the Legislative Assembly in the Year 1879 (Olympia: C.B. Bagley, Public Printer, 1879) at 118-20; White, PL-160 at Ch. II, 52].
[22] See Letter dated February 14, 1905, D-122.
[23] See id.
[24] Letter dated March 20, 1905, D-123 (emphasis added).
[25] At or around treaty time, many state legislatures had passed laws that proscribed penalties for those entering upon artificial oyster beds and taking oysters; however, these states did not extend the penalty to clams. See An Act concerning Oysters, April 28, 1851 (Ca.); Act of 1847 Ch. 86 § 14 (Va.). In fact, many state laws often protected the right of a citizen to take clams from beneath an artificial oyster bed. See Act of May 1844, § 4 (R.I.); An Act Regulating and Protecting the Planting of Oysters, June 23, 1855, § 10 (Conn.). Furthermore, the case law also supports this conclusion. See Phipps v. Maryland, 22 Md. 380 (1864) (statutes regulating the planting of oysters did not diminish public's fishing rights); Brown v. DeGroff, 50 N.J.L. 409, 14 A. 219 (1888) (oyster cultivator may not bring suit against "clammers" who entered his oyster bed to collect subjacent clams); State v. Taylor, 27 N.J.L. 117 (N.J.1858) (planted oysters may not interfere with public's fishing rights); Fleet v. Hegeman, 14 Wend. 42 (N.Y.App.Div.1835) (artificial oyster beds could be created and protected only if their creation did not interfere with the public's right to fish). The laws cited by the defendants as evidence that some states punished clammers for taking subjacent clams are not persuasive nor are they directly on point, as these laws punished trespass. Because taking subjacent clams from artificial oyster beds was considered to be a public right, such action was not an unlawful interference with another's person, property, or rights; hence the action was not a trespass. See An Act in Addition in Addition to an Act Entitled `An Act for the Growing of Oysters,' June 13, 1845 (Conn.); An Act to Encourage and Protect the Planting of Oysters, August 15, 1849 (Me.); An Act to Encourage and Regulate the Planting of Oysters in the Township of Perth Amboy, Nov. 25, 1824, § 1 (N.J.).
[26] All of the Ninth Circuit cases discussing the Equal Footing Doctrine involve claims to ownership of submerged lands. See e.g., United States v. Pend Oreille Public Utility Dist. No. 1, 926 F.2d 1502, 1509 (9th Cir.1991); United States v. Aam, 887 F.2d 190, 191 (9th Cir.1989); Puyallup Indian Tribe v. Port of Tacoma, 717 F.2d 1251, 1257 (9th Cir.1983).
[27] United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) (a treaty is a grant of rights from the Indians, not to the Indians).
[28] The decision below decisively rejected the Shively presumption as a relevant consideration:

[a]dmission of the State of Washington into the Union upon an equal footing with the original states had no effect upon the treaty rights of the Plaintiff tribes. Such admission imposed upon the State, equally with other states, the obligation to observe and carry out the provisions of treaties of the United States.
U.S. v. Washington, 384 F.Supp. at 401.
[29] See Washington I, 384 F.Supp. at 343. "Harvestable fish are those which remain to be taken after deducting the number of fish required for conservation purposes.
[30] A presumptive 50-50 allocation arises from the analogy of "in common with" fishing rights to a quasi-cotenancy:

The logic of the 50% ceiling is manifest. For an equal division  especially between parties who presumptively treated with each other as equals  is suggested, if not necessarily dictated, by the word "common" as it appears in the treaties. Since the days of Solomon, such a division has been accepted as a fair apportionment of a common asset, and Anglo-American common law has presumed that division when, as here, no other percentage is suggested by the language of the agreement or the surrounding circumstances.
443 U.S. at 686 n. 27, 99 S.Ct. at 3075 n. 27.
Ultimately, the Supreme Court grounded its 50% presumptive share on the Indians' likely understanding of the words "right of taking fish," contemporaneous treaty usages of the word "common," and interpretation of contemporaneous treaties with Britain, in which similar language was interpreted to give each signatory nation an "equal" and apportionable "share" of the share of the fish harvest from the treaty area. 443 U.S. at 677-78, 99 S.Ct. at 3070-71.
[31] In fact, in the Pre-Trial Order, admitted fact # 1, of all parties, is that "no plaintiff tribe has dwindled to just a few members."
[32] This amount was calculated by including household income from Census data for all Indians, Eskimos, and Aleuts residing on the reservations of the plaintiff Tribes. Dr. Thomas then used Census income data for Indian households and added what he called "tribal collective income" to the tribal household income. He then compared his calculation of average tribal household income to his definition of moderate living.
[33] June 9, 1855 (12 Stat. 951).
[34] In the Indian Claims Commission proceeding, the Bsigwigwilts Tribe was referred to as the "Mee-see-qua-quilch."
[35] The Upper Skagit Tribe was determined to have succeeded to the interests of the Bsigwigwilts, as discussed in this opinion. The other Tribes, the Nookachamps and the Sabelxu, were determined to be the predecessors of the Upper Skagit in Washington I. That the Upper Skagit succeeds to the interests and rights of the Nookachamps and the Sabelxu has not been contested here.